774 A.2d 420 (2001)
364 Md. 538
Timothy Johnson WILKES,
v.
STATE of Maryland.
No. 115, Sept. Term, 2000.
Court of Appeals of Maryland.
June 25, 2001.
*423 Michael R. Malloy, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.
Devy Patterson Russell, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.
Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ. *421
*422 CATHELL, Judge.
This case concerns whether police officers' use of a K-9 inspection for controlled dangerous substances (CDS) during a routine traffic stop improperly extended the traffic stop beyond what is considered reasonable under the Fourth Amendment of the United States Constitution. Petitioner, *424 Timothy Johnson Wilkes,[1] was charged by criminal information filed on October 30, 1996, with possession of cocaine with intent to distribute, bringing 28 grams or more of cocaine into the State, and related charges. On January 27, 1997, a pretrial hearing was held before the Circuit Court for Queen Anne's County concerning petitioner's motion to suppress the drug evidence. The motion was denied. Petitioner waived his right to a jury trial and the case was postponed. On April 1, 1997, petitioner entered a plea of "not guilty" and the case proceeded on an agreed statement of facts with the State pursuing only the second count. Petitioner was convicted of bringing 28 grams or more of cocaine into the State in violation of Maryland Code (1957, 1996 Repl.Vol.), Article 27, section 286A.
On May 21, 1997, petitioner was sentenced, as a repeat offender under Maryland Code (1957, 1996 Repl.Vol.), Article 27, section 293, to a forty-year prison sentence, dating from September 18, 1996. On May 23, 1997, an appeal was filed with the Court of Special Appeals. In an unreported opinion filed on October 20, 2000, the Court of Special Appeals affirmed the conviction.[2] Petitioner presented two questions for which we granted certiorari:
1. Did the Court of Special Appeals err by ruling that the police had not improperly extended the traffic stop of Mr. Wilkes in order to permit a K-9 dog inspection of his car?
2. Was there probable cause for the search of Mr. Wilkes?
We hold that the police did not improperly extend the traffic stop in order to permit a K-9 dog inspection of his car and that
there was probable cause for the search of petitioner. Accordingly, we affirm the judgment of the Court of Special Appeals.

I. Facts
The case sub judice involves a relatively routine traffic stop. Petitioner was stopped for driving 63 miles per hour in a 55 mile per hour zone on U.S. Route 301 in Queen Anne's County. During the traffic stop a search was conducted and 57.5 grams of cocaine were seized from petitioner's pants cuff. Three Maryland State Troopers testified as follows about the traffic stop at the suppression hearing.
Trooper First Class Antonio Graham (Trooper Graham) of the Maryland State Police testified that during the early morning hours of September 18, 1996, he was operating a stationary radar gun at the intersection of Route 301 and Route 302 in Queen Anne's County. At approximately 1:52 a.m., he observed two vehicles, a tractor-trailer followed by a Ford Escort with North Carolina license plates, traveling southbound in the fast lane on Route 301. The radar gun registered that the truck was traveling at a rate of speed of 64 miles per hour and the Escort at 63 miles per hour in a 55 mile per hour zone. Trooper Graham then turned on the headlights of his patrol car and began to follow the two vehicles. At this time, the Escort moved into the slow lane and pulled along the side of the truck in what Trooper Graham believed to be "an attempt to avoid [him]." He pulled up behind the Escort, activated his emergency equipment, and the Escort pulled over to a stop on the slow shoulder of southbound Route 301, approximately a half mile south of Route 302. The tractortrailer *425 apparently continued to speed south on Route 301.
Trooper Graham radioed the State Police Barracks in Centreville to advise them that he had just made a traffic stop. He then exited his police cruiser, approached the driver's side window of the Escort, and began conversing with its sole occupant, petitioner. Trooper Graham informed petitioner that he had been stopped for exceeding the posted speed limit, to which petitioner responded that he may have been traveling a little fast because he was tired. Trooper Graham then requested to see petitioner's driver's license and vehicle registration card, which petitioner provided to the officer. Petitioner had a North Carolina driver's license and was named as the owner of the vehicle on the registration card. At this point, Trooper Graham began to ask petitioner a number of questions:
After he provided the driver's license and registration I continued-well, I struck up a conversation with [petitioner], ascertaining where he was coming from, where he was going. He advised me that he was coming from New York, and he was en route back to home in Rocky Mount, North Carolina. General conversation I had, what was going on in New York, what was he up in New York for. He was coming from a family reunion in New York. I asked him how long he had been in New York. [Petitioner] advised me he was in New York for approximately two days.
...
While talking to [petitioner], it's a small vehicle, it's a hatchback vehicle, while talking to him I observed some air fresheners in the vehicle. And that's about it. I believe it was a coat, like a leather coat or something on the back seat.
Trooper Graham also testified that he did not see any luggage in the Escort. Returning to his patrol car, he radioed the Centreville Barracks to request that they conduct a check on petitioner's driver's license and registration, as well as for any possible outstanding warrants. According to Trooper Graham, this was routine procedure. He also indicated that it sometimes takes longer to complete such status checks on out-of-state licenses.[3]
Trooper Graham then returned to the Escort and asked petitioner whether the address on the driver's license was current and petitioner replied that it was accurate.[4] The record indicates that at this point the Centreville Barracks had not yet provided the requested information concerning petitioner and his vehicle. Trooper Graham returned to his patrol car and began to issue petitioner a warning citation for driving 63 miles per hour in a 55 mile per hour zone. As he began writing the warning, he decided to match the Vehicle Identification Number (VIN) on the registration card number to the VIN actually located on the Escort. He again approached the Escort and asked petitioner to open the vehicle door so that he could compare the VIN displayed on the registration card with the VIN plate on the car door.[5] When the car door opened, Trooper *426 Graham detected an unusual odor, that he was unable to recognize, coming from the vehicle. He testified that although he could not identify the odor, it was not the type he would commonly associate with air fresheners. He then compared the two VIN's and found that they did indeed match.
At this point, Troopers First Class Charles Prince (Trooper Prince) and Robert M. Penn, Jr. (Trooper Penn) of the Maryland State Police, arrived on the scene simultaneously, but in separate police cruisers. Both of the backup troopers exited their vehicles and started to approach the Escort. Trooper Graham walked from the Escort, met the two troopers halfway between the Escort and his police cruiser, and informed them of the events concerning this traffic stop as follows:
I told them that I had stopped him for speeding and told them that he advised me he was coming from New York going to North Carolina, but I didn't locate any luggage or type of clothing that would support he was in New York for two days.
I also told them that I could detect an odor coming from his vehicle and that he had a large number of little trees and type of air fresheners in his vehicle and the odor coming from the vehicle was not that of the trees or the other little baggies of air fresheners[6] that he had in the vehicle.
Trooper Graham testified on cross-examination that from the time when he first radioed in the traffic stop up to the time when the two backup troopers arrived on the scene, approximately five minutes had elapsed.
Based on Trooper Graham's suspicions, Trooper Prince, a licensed trained handler of K-9's with the Maryland State Police, decided to scan the Escort for illegal drugs with his assigned narcotics dog, "Sage." At this point, Trooper Graham returned to his vehicle to finish filling out the traffic stop documents. Trooper Penn approached the Escort, advised petitioner that Trooper Prince and Sage were going to conduct a scan of the Escort, and he informed petitioner that he needed to exit his vehicle. Trooper Penn testified that petitioner exited the vehicle and he, as a safety precaution, conducted a "pat down" of petitioner's outer garments in the area around his waist and did not find any weapons or contraband. Petitioner and Trooper Penn remained in an area in front of the Escort while Trooper Prince and Sage performed a scan of the vehicle. Two scans of the perimeter of the Escort were performed. On both scans, Sage alerted to the presence *427 of drugs at the driver's side door of the Escort. Trooper Prince testified that:
K-9, as always, I started at the left rear bumper, counterclockwise scanned the vehicle. K-9 Sage came up on the driver's door and showed a noticeable change. When I say noticeable change, his mouth closed up, he intensively searched the driver's door area, tail started wagging. His ears stood up a little bit and he aggressively searched that area of the driver's door, and gave a very solid alert, sitting down, almost immediately, once we targeted a certain area of the driver's door.
It was a very hard, very fast response. Through my training and working with the dog I have come to know the dog. The alert he gave at that time told me that there was a strong, strong presence of one of the narcotics which he is imprinted on. K-9 Sage is imprinted on four narcotics, cocaine, heroin, marijuana and hashish.
At this time I took the dog away from the vehicle, I did a second scan to try and get the dog to finish scanning the entire vehicle. Again, when he came up on the driver's door, he again showed a noticeable change, [I] could not get him away from the door, and he again gave a very hard solid response to that door.
...
When he alerts, the way he alerted that time told me there was a very strong odor of whatever narcotic he was smelling at that time.
Trooper Penn testified that after Sage alerted twice at the driver's side door of the Escort, he informed petitioner that the dog had alerted to the car for the presence of narcotics and that he was going to be detained. Trooper Penn handcuffed petitioner, placed him in the front passenger seat of his police cruiser, and locked the door.
After Sage's alert, the three troopers conducted a search of petitioner's Escort.[7] During the search of petitioner's Escort, the troopers found numerous air fresheners in unusual locations.[8] Both Trooper Graham and Trooper Prince testified that they found a white powder substance located around the gear shift of the vehicle, which they believed to be cocaine.[9] Trooper Graham retrieved a field cocaine test kit from his police cruiser, returned to petitioner's vehicle, collected a small portion of the white powder, and conducted a field test on it. The test came back positive for cocaine.[10] At this time, Trooper Graham went to Trooper Penn's vehicle and informed *428 petitioner of the results of the test.[11] During the search the troopers also found an electronic pager, a car phone, and what appeared to them to be a "drug ledger" containing names, telephone numbers, and dollar amounts logged into it. The troopers conducted a more thorough search of the Escort but failed to find any more illegal contraband.
After the troopers completed the search of the Escort, Trooper Prince left the scene to continue his routine patrol, Trooper Graham returned to his police cruiser to finish filling out the paperwork relating to the traffic stop, and Trooper Penn returned to his vehicle to conduct a more thorough search of petitioner's body. Although it is not entirely clear exactly when Trooper Graham was radioed the results of the status check concerning petitioner's driver's license, registration, and possible warrants, it was not completed until after the cocaine had been discovered in petitioner's car. When he did receive the information, he learned that there was an outstanding warrant in New York for a person with a name similar to petitioner's.[12] Trooper Graham explained:
Yes, some information had come back but it was a discrepancy between the name that [petitioner] had given us and the information that he was finding in the computer, the dispatcher, in the barrack, the information relaying to us was this subject was possibly wanted in New York on charges, but there was a few things that were not matching up to confirm that it was definitely this individual and things that were matching up saying that it was, so we was pretty much trying to get that squared away.
...
...I don't have an exact time when it came back, there was a discrepancy, like I said, between what was found in the computer or his alias and what was on the driver's license, so it was taking a little longer and with out-of-state plates it takes longer.
And Trooper Penn testified:
I think thatthe license came back valid but then I think there was a question because a routine procedure that we utilize is we'll check his driver's license, we'll check to see if he is wanted, and in most cases if some indicators are present, we'll check to see if he has any past criminal history, so I did a thorough investigation on the roadside.
While Trooper Graham was attempting to resolve the matter, Trooper Penn was conducting a more thorough search of petitioner during which he discovered a large brown paper bag tucked in the cuff of the right leg of petitioner's nylon sweat pants. When he asked petitioner what was in the bag, petitioner replied that he had just picked it up off the ground. Trooper Penn opened the bag and discovered what appeared to be a large amount of crack cocaine and seven individually sealed bags of suspected marijuana. When Trooper Penn asked petitioner whether there were any more drugs in the car, petitioner replied, "[T]hat's it." A subsequent laboratory test confirmed that the substance in the bag was 57.5 grams of cocaine. Prior to trial, petitioner moved to suppress the items found in the Ford Escort, on his person, and his statements to the state *429 troopers. The motion was denied. At a subsequent bench trial, petitioner was convicted of transporting 28 grams or more of cocaine into the State of Maryland in violation of Maryland Code (1957, 1996 Repl.Vol.), Article 27, section 286A. The conviction was affirmed by the Court of Special Appeals. We agree with the holding of that courtthe police did not improperly extend the traffic stop in order to permit a K-9 dog inspection of his car. Additionally, we hold that there was probable cause for the search of petitioner. Accordingly, we affirm the judgment of the Court of Special Appeals.

II. Discussion
In our review of the trial court's denial of petitioner's motion to suppress, we are limited to the record of the suppression hearing. See Rowe v. State, 363 Md. 424, 431-32, 769 A.2d 879, 883 (2001); Cartnail v. State, 359 Md. 272, 282, 753 A.2d 519, 524 (2000); Ferris v. State, 355 Md. 356, 368, 735 A.2d 491, 497 (1999); In re Tariq A-R-Y, 347 Md. 484, 488, 701 A.2d 691, 693 (1997), cert. denied, 522 U.S. 1140, 118 S.Ct. 1105, 140 L.Ed.2d 158 (1998). We review the facts found by the trial court in the light most favorable to the prevailing party, in the case at bar, the State. See Rowe, 363 Md. at 431-32, 769 A.2d at 883. We extend great deference to the fact finding of the suppression court and accept the facts as found by that court unless clearly erroneous. See Riddick v. State, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990), overruled in part on other grounds by Wengert v. State, 364 Md. 76, 83-85, 771 A.2d 389, 393-94 (2001). We will review the legal questions de novo and based upon the evidence presented at the suppression hearing and the applicable law, we then make our own constitutional appraisal. Id.; see Rowe, 363 Md. at 431-32, 769 A.2d at 883; Stokes v. State, 362 Md. 407, 413-14, 765 A.2d 612, 615 (2001); Cartnail, 359 Md. at 282-83, 753 A.2d at 524-25; Ferris, 355 Md. at 368, 735 A.2d at 497; In re Tariq A-R-Y, 347 Md. at 489, 701 A.2d at 693.
Petitioner contends that the Court of Special Appeals erred in holding that the trial court properly denied his motion to suppress the items recovered in his vehicle, on his person, and his statements to the police. Specifically, he posits that the troopers lacked reasonable articulable suspicion to extend the traffic stop past the time necessary to issue him a warning citation, and thus, the canine search of his vehicle was a violation of his constitutional rights. In addition, petitioner contends that Sage's alert for the presence of drugs did not create probable cause to handcuff, search, and arrest him.

a. The troopers did not improperly extend the traffic stop
Petitioner's contention that the troopers lacked reasonable articulable suspicion to extend the traffic stop past the time necessary to issue him a warning citation, and thus, that the canine search of his vehicle was a violation of his constitutional rights, has little merit. The record establishes that the traffic stop was not so extended. The K-9 unit arrived on the scene and conducted the scan of petitioner's Escort prior to Trooper Graham receiving radio verification of the validity of petitioner's driver's license, vehicle registration card, and warrants check. The traffic stop was ongoing at the time the K-9 scan was employed. At the suppression hearing, there was no evidence that the police extended or delayed the traffic stop beyond the time necessary to reasonably complete the actions needed to resolve the initial purpose for the stop. A reasonable inference from the evidence in the record is that the K-9 scan occurred while the *430 initial reason for the traffic stop was still being investigated.
The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
As its plain language indicates, the Fourth Amendment protects the public from unreasonable searches and seizures. See Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); United States v. Mendenhall, 446 U.S. 544, 550-51, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497, reh'g denied, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). There is no question that the stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment. See Whren, 517 U.S. at 809-10, 116 S.Ct. at 1772, 135 L.Ed.2d 89; Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). It is clear that, as in the case of pedestrians, searches and seizures of motorists who are merely suspected of criminal activity are to be analyzed, for purposes of the Fourth Amendment, under the framework established in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (applying Terry analysis to stop of vehicle suspected of transporting drugs); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (applying Terry analysis to stop of vehicle suspected of transporting illegal aliens).
In determining whether there has been a violation of the Fourth Amendment right against unreasonable searches and seizures, the Supreme Court has stated:
The touchstone of our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).
Pennsylvania v. Mimms, 434 U.S. 106, 108-09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331, (1977); see also Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996); Stokes, 362 Md. at 412-13 n. 7, 765 A.2d at 615 n. 7.
We recently had the opportunity to summarize several Supreme Court holdings concerning the Fourth Amendment as it relates to traffic stops in Ferris, 355 Md. at 369, 735 A.2d at 497-98:
The Supreme Court has made clear that a traffic stop involving a motorist is a detention which implicates the Fourth Amendment. See United States v. Sharpe, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (analogizing the degree of intrusiveness of the usual traffic stop to the degree of restraint imposed by the typical Terry stop). It is equally clear, however, that ordinarily such a stop does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation. Whren v. United

*431 States, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Nonetheless, the Supreme Court has also made it clear that the detention of a person "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion).
Because it is not disputed that Trooper Graham, at least in significant part, properly stopped petitioner for exceeding the speed limit, the initial seizure was justified. Thus, the threshold issue before us concerns the rule of law enunciated by the Supreme Court in Florida v. Royer, suprawhether the traffic stop was longer than necessary to effectuate the purpose of the stop. See also Terry, 392 U.S. at 19, 88 S.Ct. at 1878, 20 L.Ed.2d 889 ("The scope of the search must be `strictly tied to and justified by' the circumstances which rendered its initiation permissible."). We noted in Ferris, 355 Md. at 372, 735 A.2d at 499:
Once the purpose of [the traffic] stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. See Royer, 460 U.S. at 500, 103 S.Ct. at 1325-26. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable articulable suspicion that criminal activity is afoot.
In Ferris, a state trooper issued a traffic citation to the driver and returned his driver's license and registration, then asked the driver to exit the vehicle and continued a line of questioning. The trooper eventually searched the vehicle and discovered a large amount of marijuana. We concluded that the traffic stop came to an end upon the trooper's delivery of the citation and return of Ferris's driver's license and registration and that the continued questioning, which resulted in the discovery of the illegal drugs, amounted to a second seizure, which was unsupported by reasonable articulable suspicion.
Ferris is distinguishable from the case sub judice. In the case sub judice, the initial justified detention was not concluded at the time the K-9 dog twice alerted to the presence of narcotics in the car. We do not need to consider whether petitioner consented to a continuing intrusion or whether Trooper Graham at the time of the K-9 scan had a reasonable articulable suspicion that criminal activity was afoot, because the purpose of the traffic stop was not completed at the time the scan was conducted on petitioner's Escort. No warning or citation had been issued prior to the K-9 scan. At that point, it was a single, continuous stopthere was not an end of one stop and the beginning of another.
We also find this case in line with our decision in Gadson v. State, 341 Md. 1, 668 A.2d 22 (1995). In Gadson, a prospective visitor to the House of Correction in Jessup, Maryland, was stopped in his truck at a guard booth approximately a quarter of a mile from the prison. At the guard booth, a state trooper[13] informed Gadson that he was going to perform a K-9 scan. Gadson objected and requested permission to leave the area. The trooper denied the request, conducted a K-9 scan during which the drug dog alerted to the presence of narcotics, discovered marijuana in the truck, and arrested Gadson. We held that:

*432 The articulated purpose of the detention at issue in this case was to prevent illegal drugs from entering the House of Correction. Once Gadson agreed to turn back from the guard booth, that purpose was wholly accomplished. Therefore, further detention could only be justified if [the trooper] possessed reasonable, articulable suspicion that Gadson had engaged in criminal activity. Because there was no proper basis for such suspicion, the detention of Gadson was unreasonable under the Fourth Amendment....
Id. at 20-21, 668 A.2d at 32. The rule of law espoused in Gadson holds true today once the initial purpose for a stop is fulfilled, a continued detention is only permissible if justified by additional independent reasonable articulable suspicion.[14] However, the facts involved in Gadson are distinguishable from the case sub judice because, as we have indicated, supra, the initial purpose for the stop of petitioner's Escort was not completed and was still ongoing at the time the K-9 scan was conducted. In the case at bar there was no further unjustified detention as there was in Gadson.
The Court of Special Appeals has had the opportunity to consider factually similar cases. In McKoy v. State, 127 Md. App. 89, 732 A.2d 312 (1999), the Court of Special Appeals dealt with a case with facts almost identical to those in the case sub judice and came to the same conclusion as we do in the case at bar. In that case, the police officer had not yet completed writing the traffic citation when the K-9 unit arrived on the scene, conducted a K-9 scan, and alerted for drugs. As that court stated:
Trooper Nolan had not completed writing the citations for [the driver] at the time the K-9 alerted to the presence of drugs in the vehicle, and he had not yet received a response to his request regarding the validity of appellant's license[15] at the time of the scan. Trooper Nolan did not detain appellant and [the driver] any longer than reasonably necessary to determine whether [there was] a valid license.
Id. at 101, 732 A.2d at 318; see In re Montrail M., 87 Md.App. 420, 436-37, 589 A.2d 1318, 1326-27 (1991) (K-9 search of a vehicle, which detected narcotics, while awaiting results of computer check on driver's license and vehicle registration, was permissible), aff'd, 325 Md. 527, 601 A.2d 1102 (1992).
In Pryor v. State, 122 Md.App. 671, 716 A.2d 338, cert. denied, 352 Md. 312, 721 A.2d 990 (1998), the relevant facts were almost identical to those of the case at bar except in Pryor, the driver who was stopped for exceeding the speed limit was detained and forced to wait on the scene for the K-9 unit to arrive. The Court of Special Appeals expounded the rule of law noted in Florida v. Royer, supra, by stating that a person stopped for a minor traffic violation "cannot be detained at the scene of the stop longer than it takesor reasonably should taketo issue a citation for the traffic violation that the motorist committed." Pryor, 122 Md.App. at 674-75, 716 A.2d at 340.[16] The Court of Special *433 Appeals held that waiting for the K-9 unit to arrive amounted to an unjustified second detention. See Graham v. State, 119 Md.App. 444, 456, 705 A.2d 82, 88 (1998) (detention of the passenger for twenty-five minutes between the initial stop of the vehicle and the arrival of a canine officer and drug-sniffing dog was unreasonable and violated the Fourth Amendment when purpose of stop satisfied within first five minutes); Munafo v. State, 105 Md.App. 662, 673, 660 A.2d 1068, 1073 (1995) (after the police officer learned that the license and registration were in order, the additional brief delay, which was not supported by reasonable articulable suspicion, was entirely unjustified); Snow v. State, 84 Md.App. 243, 267, 578 A.2d 816, 827 (1990) (the purpose underlying the initial traffic stop had been realized when the officer issued the warning, and there was no reasonable articulable suspicion to support the second act of detaining the driver for the K-9 scan of the vehicle). Neither an unjustified extension of the traffic stop, nor such a second detention were present in the case subjudice.
In determining whether this traffic stop violated the Fourth Amendment by extending beyond the initial purpose of the stop, it is helpful if we again consider the facts and circumstances of the case at bar in their entirety as presented on the record during the suppression hearing. As we noted, supra, Trooper Graham had probable cause to make the initial traffic stop. His actions throughout the duration of the traffic stop were legally permissible, albeit thorough. From the time Trooper Graham pulled petitioner's car over to the side of the road to the time the K-9 arrived was approximately five minutes. The scan occurred shortly thereafter. In any event, the trooper was not constrained by any set time limit.
The Supreme Court has expressly rejected imposing rigid time limitations on traffic stops. See Sharpe, 470 U.S. at 685, 105 S.Ct. at 1575, 84 L.Ed.2d 605. In that case, the Supreme Court noted that as "[m]uch as a `bright-line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." Id. The Supreme Court continued:
In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by `less intrusive' means does not, itself, render the search unreasonable." The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.
Id. at 686-87, 105 S.Ct. at 1575-76, 84 L.Ed.2d 605 (citations omitted).
*434 The general theme of petitioner's argument is that Trooper Graham unreasonably delayed the traffic stop long enough for the K-9 unit to arrive by asking petitioner background questions, checking the Escort's VIN, asking if the address on his driver's license was current, and conducting a warrants check.[17] There was no evidence presented at the suppression hearing that the trooper prolonged the stop any longer than necessary. His goal was clearly to conduct a diligent and complete traffic stop. The fact that he continued to investigate the scene while waiting for the results of petitioner's background check does not amount to a violation of petitioner's Fourth Amendment rights.[18]
We now continue our consideration of whether, in effecting a traffic stop, the troopers' actions at the scene were reasonable under a Fourth Amendment analysis. Conducting checks of driver's licenses, vehicle registration, and possible warrants is reasonable. See United States v. Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997) ("An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen. However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning.") (internal citations omitted);[19]United States v. McRae, 81 F.3d 1528, 1535 n. 6 (10th Cir.1996) (noting that an officer conducting a routine traffic *435 stop is authorized to conduct a computer check); State v. Holman, 221 Neb. 730, 732-33, 380 N.W.2d 304, 307 (1986) (check of driver's history, registration, and for outstanding warrants is part of the normal procedure for a traffic stop); State v. Bell, 382 So.2d 119, 120 (Fla.Dist.App.1980) (police are authorized to determine if there is an outstanding warrant for arrest during stop); Clark v. State, 171 Ind.App. 658, 358 N.E.2d 761, 763 (1977) (Police officer's radio call to headquarters to check on any outstanding warrants of defendant was within the scope of the initial investigatory stop). Such holdings make sense as modern technology has availed police officers with the ability to quickly access relevant information without unnecessarily prolonging the duration of the stop or unreasonably increasing the level of intrusion. See United States v. Gonzalez, 763 F.2d 1127, 1130 (10th Cir.1985) ("The police officer had a car radio and contact thereby with dispatchers who had instant access to the National Crime Information Center (NCIC) computer records that could quickly resolve, with reasonable certainty, whether there were warrants outstanding against the driver and whether the car had been reported stolen.").
The action taken by Trooper Graham to run computer checks on petitioner's driver's license, vehicle registration, and possible warrants was reasonable. Similarly, the investigatory measures implemented by Trooper Graham and the backup troopers during the time they were awaiting the results of the computer checks were permissible. In 1993, the Court of Appeals for the Fifth Circuit considered a similar argument in a case where police questioned a driver and passenger while awaiting the results of a computer check in United States v. Shabazz, 993 F.2d 431 (5th Cir.1993). That court stated:
Here, appellants cannot successfully claim that the detention exceeded its original scope. Appellants concede, and we have no doubt, that in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation. In this case, Officer LaChance asked Shabazz to exit the vehicle and produce his driver's license. He then called in for a computer check of the license. The questioning that took place occurred while the officers were waiting for the results of the computer check. Therefore, the questioning did nothing to extend the duration of the initial, valid seizure. Because the officers were still waiting for the computer check at the time that they received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation.
Id. at 437 (footnote omitted) (citations omitted); see also United States v. Crain, 33 F.3d 480, 485 (5th Cir.1994) ("[W]hen questioning takes place while officers are waiting for the results of a computer checkand therefore does not extend the duration of the stopthe questioning does not violate Terry"). Thus, a reasonable continued investigation of the scene, while awaiting the results of a computer check was permissible police procedure under the Fourth Amendment.
We now further consider whether a K-9 scan of a car, while officers are awaiting the results of a computer check, is permissible. In United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court addressed the issue of "canine sniffs" in great detail. In Place, law enforcement officers at an airport seized Place's luggage to subject the bags to a "sniff test" by a K-9 dog trained to detect narcotics. The Supreme Court held that the canine sniff was not a search within the meaning of the Fourth Amendment:

*436 A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose contraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here-exposure of [Place's] luggage, which was located in a public place, to a trained caninedid not constitute a search within the meaning of the Fourth Amendment.
Id. at 707, 103 S.Ct. at 2644-45, 77 L.Ed.2d 110.[20]
Additionally, in United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Supreme Court considered whether a chemical test used to determine if a substance was a controlled dangerous substance was a search. The Supreme Court expanded on its holding in Place and held that a police investigatory tool, such as a dog sniff or a chemical test, is not a search if it merely reveals the presence or absence of contraband because the privacy interest in possessing contraband is not one that society recognizes as reasonable. "Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment." Jacobsen, 466 U.S. at 124, 104 S.Ct. at 1662, 80 L.Ed.2d 85. Because a K-9 scan, under the circumstances such as those present here, is neither a search nor a seizure, Fourth Amendment issues, in respect to such a K-9 scan, do not arise. Thus, Trooper Prince did not need reasonable articulable suspicion of drug-related criminal activity prior to subjecting petitioner's Escort to the K-9 scan, provided the initial purpose for the stop had not been resolved.[21]See United States v. Dovali-Avila, *437 895 F.2d 206, 207 (5th Cir. 1990); United States v. Morales-Zamora, 914 F.2d 200, 203 (10th Cir.1990).
In the case sub judice, the evidence indicates that the computer check had not been completed by the time the K-9 scan was conducted. Thus, the K-9 scan was simply a legitimate police investigatory tool utilized during the legal duration of the initial stop. The actions the troopers took while waiting for the results of the driver's license and vehicle registration, as well as the warrants check,asking questions, checking the VIN, and employing a K-9 scan-were permissible.
A reasonable inference from the testimony at the suppression hearing supports the trial court's finding that the K-9 scan was conducted while the troopers were still awaiting the results of the computer check. As the Court of Special Appeals noted in its unreported opinion:
Although Trooper Graham said he did not recall when he received information concerning [petitioner], he said that if he had received such information, he would have completed and issued the traffic citation. Because Trooper Graham had not yet completed the traffic citation before the back-up units arrived, he said it was not likely that he had received such information prior to their arrival. In any event, Trooper Graham testified that it was only after "Sage" had alerted to drugs that he received information that there might be an outstanding warrant for [petitioner] in New York.
Although the record is unclear, it appears that one of two series of events occurred: (1) the K-9 scan was conducted prior to Trooper Graham receiving any information from the Centreville Barracks concerning the computer check; or (2) the K-9 scan was employed after Trooper Graham received information that the driver's license and vehicle registration were valid but that the warrants check was incomplete, inconclusive, and indicated that petitioner may have had a warrant for his arrest in New York.
Regardless of which series of events occurred, the K-9 scan was permissible. If the K-9 scan was conducted prior to Trooper Graham receiving any information from the Centreville Barracks concerning the computer check, then, as we have indicated, supra, the initial purpose for the traffic stop was not yet fulfilled and the K-9 scan was justified without additional independent reasonable articulable suspicion. If the K-9 scan was employed after Trooper Graham received information that the driver's license and vehicle registration were valid but that the warrants check was incomplete, inconclusive, and indicated that petitioner may have had an outstanding warrant for his arrest in New York, then the K-9 scan was permissible for a different reason. Once the trooper received the warrant check information that indicated that petitioner might have a warrant for his arrest in New York, the troopers had independent reasonable articulable suspicion to detain petitioner until the matter was resolved. The initial continuation of the stop was justified until the complete results of the computer check were received. Once Trooper Graham received information that it appeared that petitioner may have a warrant for his arrest in New York, but that the Centreville Barracks needed more time to investigate, he would have been remiss in his duties to end the traffic stop and allow petitioner to continue. Regardless of which series of events occurred, the K-9 scan was permissible because the record reflects that the K-9 scan was conducted before the issue of possible warrants for petitioner's arrest *438 in New York was resolved.[22] The K-9 scan of petitioner's automobile did not violate the dictates of the Fourth Amendment.

b. There was probable cause to search petitioner
Petitioner also contends that the troopers did not have probable cause to handcuff, arrest, and search him. Specifically, he claims that neither the dog alert on his Escort nor the discovery of cocaine residue in the Escort provided probable cause to make a warrantless arrest of him. We disagree.
Maryland Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), Article 27, section 594B(c) provides:
A police officer may arrest a person without a warrant if the officer has probable cause to believe that a felony has been committed or attempted and that such person has committed or attempted to commit a felony whether or not in the officer's presence or view.
We have said that:
"The rule of probable cause is a nontechnical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." As the Supreme Court said in Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1310-11, 93 L.Ed. 1879 (1949):
In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.
* * * * * *
Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating ... often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.
Doering v. State, 313 Md. 384, 403, 545 A.2d 1281, 1290-91 (1988) (some citations omitted).[23]
*439 As we discussed, supra, the troopers' actions on the scene of the traffic stop up to and through the time of the K-9 scan were reasonable and justified. We now consider whether their actions after the K-9 scan alerted to the presence of drugs in the Escort were also appropriate. Specifically, we concern ourselves with petitioner's detention. "The occurrence vel non of an arrest is a legal issue to be determined initially by the trial court, and subject to review on appeal." State v. Evans, 352 Md. 496, 509 n. 9, 723 A.2d 423, 429 n. 9, cert. denied, 528 U.S. 833, 120 S.Ct. 310, 145 L.Ed.2d 77 (1999). The trial court found that petitioner was arrested when he was handcuffed and placed in the police cruiser, after the K-9 scan alerted to narcotics in his vehicle but before a search of the vehicle took place. As we have noted:
"We have defined an arrest in general terms as the detention of a known or suspected offender for the purpose of prosecuting him for a crime. An arrest is effected (1) when the arrestee is physically restrained or (2) when the arrestee is told of the arrest and submits. In sum, `an arrest is the taking, seizing or detaining of the person of another, interalia, by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest.'"
Barnhard v. State, 325 Md. 602, 611, 602 A.2d 701, 705-06 (1992) quoting Little v. State, 300 Md. 485, 509-10, 479 A.2d 903, 915 (1984). It is clear that at this point, petitioner was detained and was not free to leave. That detention, however, was, under the circumstances, reasonable.
The troopers were able to conduct a lawful search of petitioner's vehicle because after the K-9 scan alerted to the presence of narcotics they had probable cause to do so. We have noted that once a drug dog has alerted a trooper "to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle]." Gadson, 341 Md. at 8, 668 A.2d at 26; see Dovali-Avila, 895 F.2d at 207 ("[A] `dog alert' is sufficient to create probable cause to conduct a warrantless vehicle search."); Timmons v. State, 114 Md.App. 410, 417, 690 A.2d 530, 534 (1997); Montrail M., 87 Md.App. at 437, 589 A.2d at 1326; Snow, 84 Md.App. at 248, 578 A.2d at 818.[24]
*440 Once the troopers searched the vehicle and found and tested the cocaine residue, they then had probable cause to complete a warrantless arrest of petitioner. At this point in time, the troopers had: (1) witnessed a drug dog alert to the presence of narcotics in the vehicle; (2) discovered cocaine residue in the vehicle; (3) smelled an odor of cocaine in the vehicle; (4) noticed a large amount of air fresheners throughout the car, which they testified is indicative of an attempt to mask the odor of cocaine; (5) found what they believed to be a drug ledger in the vehicle; and (6) noticed a possible contradiction in petitioner's story because he said he had been in New York for two days yet had no luggage. Looking at the totality of the circumstances and applying the principles outlined in Doering, supra, to the aggregate facts listed, supra, we conclude that probable cause existed to detain and arrest petitioner.
We now consider whether the troopers had probable cause to conduct a search of petitioner's body after the search of the vehicle. We have recognized "that the right of the police to search a suspect incident to a lawful arrest follows automatically from the arrest." Evans, 352 Md. at 508, 723 A.2d at 429, citing United States v. Robinson, 414 U.S. 218, 225-26, 94 S.Ct. 467, 472, 38 L.Ed.2d 427 (1973). Thus, the subsequent search of petitioner's body, which resulted in the discovery of a substantial amount of crack cocaine and marijuana, was permissible.

III. Conclusion
The record reflects that the traffic stop in question in the case at bar was not extended beyond the period necessary to complete that stop. The K-9 unit arrived on the scene and conducted the scan of petitioner's Escort prior to Trooper Graham receiving radio verification of the validity of petitioner's driver's license, vehicle registration card, and warrants check. Thus, the traffic stop was ongoing at the time the K-9 scan was employed. After that point, the troopers had probable cause to detain petitioner, search his car and then, upon discovery of the cocaine in the vehicle, arrest and search petitioner. We hold that the police did not improperly extend the traffic stop in order to permit a K-9 dog inspection of his car and that there was probable cause for the search of petitioner. Accordingly, we affirm the judgment of the Court of Special Appeals.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONER TO PAY THE COSTS.
NOTES
[1] The record indicates that petitioner is also known as Timothy Johnson.
[2] The delay of over three years was apparently due to difficulty in obtaining transcripts from the court reporter. The record was not transmitted to the Court of Special Appeals by the Circuit Court for Queen Anne's County until February 2, 2000.
[3] Any further delay could also possibly be explained by the use of more than one name by petitioner. See, supra, note 1. Trooper Graham testified that there appeared to be a problem locating petitioner's name in the North Carolina computer system.
[4] Trooper Graham explained that he did so because, "a lot of times people change their address and don't give their correct address and they come to court and say they never received the summons."
[5] Rather than checking the VIN that is generally visible on most vehicles through the windshield, Trooper Graham asked petitioner to open the car door so he could check the VIN located on the door panel. Although we find this action curious, the State contends in its brief to this Court that such an approach "is understandable that in light of the fact that VIN's are ordinarily long and printed on a small space, and that this incident took place at night, that the VIN was not readily `visible' through the windshield of the vehicle." The Supreme Court noted in a Fourth Amendment traffic stop case that, "The VIN, which was the clear initial objective of the officer, is by law present in one of two locationseither inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile. Neither of those locations is subject to a reasonable expectation of privacy." New York v. Class, 475 U.S. 106, 118, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986).
[6] As Trooper Penn later testified, the presence of a large quantity of air fresheners is noteworthy. "It has been something that I have learned through my training that air fresheners can and sometimes are often used to mask the odor of a narcotic.... This was an overwhelming amount and I felt that it was exactly that, a cover-up for the detection of narcotics."
[7] The record indicates that at some point after Sage alerted to the possibility of the presence of narcotics in the Escort but prior to the troopers' search of the vehicle, Trooper Prince read petitioner his Miranda rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Petitioner acknowledged that he understood his rights and that he did not know of any narcotics or drugs in the vehicle.
[8] Trooper Graham testified:

I saw air fresheners stuck underneath the dashboard, I saw air fresheners stuck underneath the driver's seat, I found air fresheners stuck in the trunk under the spare tire, I found air fresheners stuck under the bench seat, the rear bench passenger seat. I found air fresheners stuck in the center console, in the glove box.
[9] Trooper Prince also testified that once in the Escort, he noticed a strong odor of cocaine, with which he was familiar due to his specialized police training.
[10] The troopers also testified that the amount of white powder found in the gear shift was of a very small quantityprimarily residueand that after they conducted the field test, there was very little, if any, to collect as evidence. As Trooper Prince said, "it was just enough to field test. It wasn't a lot."
[11] As we indicated, supra, note 7, petitioner had received Miranda warnings by this time.
[12] Traveling between vehicles would not delay Trooper Graham's receiving of information from the Centreville Barracks, because he was wearing a repeater, which we understand essentially to be a second radio carried on his body designed to repeat any information radioed to his patrol car.
[13] The K-9 handler in Gadson was also named Trooper Charles Prince.
[14] An exercise of a constitutional or other right, such as the right to lawfully leave a particular place, does not, generally, create "articulable suspicion" that "criminal activity is afoot."
[15] In McKoy, supra, the petitioner was the passenger in the vehicle. The trooper checked the passenger's license apparently because the driver did not have a license and was not an authorized driver of the rental car.
[16] However that court also recognized that there may be reasons that justify the extension of a traffic stop: "[t]his is not a case in which an extended detention of the motorist could be justified by the need to administer a `field sobriety' test or by technical difficulties in determining the status of the motorist's license or the ownership of the vehicle that has been stopped." Pryor, 122 Md.App. at 681-82 n. 7, 716 A.2d at 343 n. 7 (emphasis added).
[17] Petitioner implies that Trooper Graham's purpose for the stop was pretextual. Even if it was pretextual, Trooper Graham's conduct would not be invalidated because he had probable cause to make the traffic stop and the K-9 scan was performed prior to receiving the complete results of the computer check. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren, 517 U.S. at 813, 116 S.Ct. at 1774, 135 L.Ed.2d 89.
[18] It can be argued that a police officer has wide discretion to conduct such an investigation once he or she has probable cause that a driver has committed a traffic violation. Pursuant to the Supreme Court's recent opinion, Atwater v. City of Lago Vista, 532 U.S. 318, ___, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549 (2001), "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." The Supreme Court rationalized:

[W]e have traditionally recognized that a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review. Often enough, the Fourth Amendment has to be applied on the spur (and in the heat) of the moment, and the object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made. Courts attempting to strike a reasonable Fourth Amendment balance thus credit the government's side with an essential interest in readily administrable rules.
Id. at ___ - ___, 121 S.Ct. at 1553-54, 149 L.Ed.2d 549.
[19] It is to note that in Mendez, supra, the police officer's check for outstanding warrants came back negative at what appears to be approximately the same time as the results of the driver's license and vehicle registration search. See Mendez, 118 F.3d at 1428. That court did not appear to be attempting to distinguish between the driver's license/vehicle registration searches and the check for warrantsmerely that once all the checks were completed and the reasonable articulable suspicion, which justified the initial purpose for the stop was eliminated, there was no longer any justifiable or legitimate reason for detaining the driver.
[20] We recognize the apparent difference between a K-9 scan conducted on a vehicle during a traffic stop and a K-9 scan conducted on luggage at an airport, however, we see no difference in their relationship to the Fourth Amendment. A K-9 scan alone constitutes neither an intrusive search in the traditional sense nor a seizure and thus, there are few Fourth Amendment implications.
[21] We do not mean to indicate that the troopers did not have a reasonable articulable suspicion at this time. Clearly, Trooper Graham had witnessed several clues-the strange odor in the vehicle, the numerous air fresheners, and the lack of luggage-that may have aroused his suspicions. The issue of whether this evidence amounts to a reasonable articulable suspicion is not before us. Regardless, it was not necessary to generate such reasonable articulable suspicion because the K-9 scan by itself, under these circumstances, was neither an impermissible search nor a seizure, and thus does not implicate Fourth Amendment violations.
[22] Under the facts of the instant case, the K-9 scan, at the least, occurred while the troopers were waiting for conclusive warrant information, and that period of time, itself, was not unreasonably long. An overly long period of waiting for warrant information may well create problems relating to Fourth Amendment compliance. Such problems do not exist in the instant case.
[23] In Atwater v. City of Lago Vista, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549, the Supreme Court recently had the opportunity to review the standard for arrests. In Atwater, a woman was pulled over in Texas because neither she nor her two passengers were wearing seatbelts. This minor traffic violation was "punishable by a fine not less than $25 or more than $50." Id. at___, 121 S.Ct. at 1541, 149 L.Ed.2d 549. Although the violation was punishable only by fine, the Texas seatbelt statute also expressly authorized a police officer to arrest without a warrant a person found in violation of the statute. Instead of issuing Atwater a citation, the police officer arrested her. She argued to the Supreme Court that the Fourth Amendment forbids a warrantless arrest for a minor criminal offense such as a misdemeanor seatbelt violation punishable only by fine. The Supreme Court upheld her arrest stating that

the standard of probable cause "applie[s] to all arrests, without the need to `balance' the interests and circumstances involved in particular situations." If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.
Id. at ___, 121 S.Ct. at 1557, 149 L.Ed.2d 549 (alteration in original). Atwater's arrest probably would not have been upheld had she been arrested in Maryland. Maryland Code (1977, 1999 Repl.Vol.), section 26 202 of the Transportation Article allows a police officer to arrest without a warrant for a violation of the Maryland Vehicle Law only for specific types of violations. Failure to wear a seatbelt is not one of these exceptions, and, relevant to the case at bar, neither is exceeding the speed limit.
[24] Moreover, some jurisdictions have held that once a drug dog has alerted the trooper to the presence of illegal drugs in a vehicle, sufficient probable cause existed to support a warrantless arrest. See United States v. Klinginsmith, 25 F.3d 1507, 1510 (10th Cir.) ("[W]hen the dog `alerted,' there was probable cause to arrest [defendants] ...."), cert. denied, 513 U.S. 1059, 115 S.Ct. 669, 130 L.Ed.2d 602 (1994); United States v. Williams, 726 F.2d 661, 663 (10th Cir.1984) ("[A] drug sniffing dog's detection of contraband in luggage `itself establish[es] probable cause, enough for the arrest, more than enough for the stop.'" (alteration in original) quoting United States v. Waltzer, 682 F.2d 370, 372 (2d Cir.1982), cert. denied, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983)).