924 A.2d 1129

**Reginald Anthony LONGSHORE**

v.

**STATE of Maryland.**

**No. 139 Sept.Term, 2004.**

Court of Appeals of Maryland.

June 8, 2007.

488

490

492

Gary E. Bair (Bennett & Bair, LLP), on brief, Greenbelt, MD, for Petitioner/Cross-Respondent.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland), on brief, Baltimore, MD, for Respondent/Cross-Petitioner.

BELL, C.J., RAKER, WILNER,* CATHELL,
HARRELL, BATTAGLIA and GREENE, JJ.

BELL, Chief Judge.

In *Terry v. Ohio*, the Supreme Court held that a police officer may stop and detain a person briefly for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity "may be afoot." 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968); *see also Quince v. State*, 319 Md. 430, 433, 572 A.2d 1086, 1087–1088 (1990), *Anderson v. State*, 282 Md. 701, 706, 387 A.2d 281, 284 (1978) ("[T]he real thrust of Terry is directed at instances in which there is reasonable suspicion that someone is about to commit or has just committed a crime"). In this case, we again consider under what circumstances a brief detention or investigative stop becomes a de facto arrest, for the justification of which, rather than mere reasonable articulable suspicion, probable cause must be shown. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989) (explaining that reasonable suspicion is a less demanding standard than probable cause); *see also Quince*, 319 Md. 430, 433, 572 A.2d 1086, 1088 (holding that the level of suspicion required for a stop is less demanding than that for probable cause), *Watkins v. State*, 288 Md. 597, 606, 420 A.2d 270, 275 (1980) (holding that the reasonable suspicion justifying an investigative stop involves a significantly lower degree of objective evidentiary justification than does a probable cause for arrest).

## I.

In the case *sub judice*, the Charles County Sheriff's Department received a tip from a confidential informant. Claiming that he had both witnessed and videotaped a drug transaction

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

in front of the Saint Charles Towne Mall, the informant produced a videotape showing two men, John Carlson, and the petitioner, Reginald Longshore ("Longshore"), get into a Ford Expedition, which was parked in the mall parking lot and remain there for a short time, while a third person stood by the driver's door. No drugs, paraphernalia, or money could be seen on the videotape. The police detective, Smith, nonetheless, set up surveillance at the mall and with regard to Carlson's vehicle, a Toyota.

Longshore drove away from and, a short time later returned to, the mall. Upon his return, he was followed into the mall by a second detective, Clark, who then observed him meeting with the two people with whom he earlier had been seen, and recorded, in the videotape. As was the case in the videotape, although the three people were together, no drugs actually were observed on this occasion.

When Carlson drove away from the mall, his car was stopped by the police. He consented to being searched. According to the officers, uncovered in the search was a "quantity of marijuana and cocaine." [1]

At about the same time, a certified drug sniffing dog, Tonya, was brought to the mall to scan Longshore's Ford Expedition, which was again parked on the mall parking lot. Longshore was, at the time, still inside the mall. Tonya scanned Longshore's Expedition and two other cars in the parking lot, with negative results; Tonya did not alert to the presence of any drugs in any of the cars.

Subsequently, Longshore left the mall, driving his Expedition. He was stopped by a third detective, Detective Edge. Detective Edge informed Longshore that he believed that there were drugs in his vehicle. When Longshore declined to consent to a search of the vehicle, Detective Edge, although aware of the prior negative scan, called for Tonya to scan the

---

1. Only trace amounts, insufficient for chemical analysis, of cocaine and marijuana were found in Carlson's car.

Expedition again. While waiting for Tonya to arrive, Longshore was placed in handcuffs.

Tonya arrived within two minutes and the scan was conducted. During this second scan, the driver's side window was down, and, as with the first one, the engine was turned off. Upon scanning the exterior of the vehicle, this time, Tonya alerted, indicating the presence of drugs in the area of the rear "wheel well underneath the vehicle." A subsequent search uncovered no drugs in the rear area of the vehicle or underneath it, however. Tonya then was allowed into the vehicle, at which time she alerted to the center console area of the ceiling. A search of that area uncovered a pill bottle containing crack cocaine.[2]

Longshore was indicted by a Charles County grand jury on charges of possession of cocaine with intent to distribute and possession of cocaine. He moved, prior to trial, to suppress the pill bottle and the cash as the fruits of an illegal search of his truck and of his person. The Circuit Court for Charles County denied the motion. Regarding the stop of Longshore's vehicle, the court ruled that the informant's videotape and the drugs found in Carlson's car provided sufficient reasonable suspicion to warrant the stop, which it found continued for no more than 15 minutes before the discovery of the drugs in the ceiling console. The court did find that Longshore had been handcuffed at the scene before Tonya arrived to perform the second scan.

The suppression court also addressed Tonya's reliability. It noted that Tonya's training officer and custodian "testified at great length as to Tonya's training and certifications and they weren't really challenged by anyone at the hearing." The court concluded that "Tonya is a reliable indicator as to the presence of controlled dangerous substances."

---

**2.** A subsequent search of Longshore's person revealed that he possessed $1,091 in cash. Longshore, at trial, offered the testimony of witnesses to explain his possession of this money.

Regarding the search of Longshore's vehicle, the court ruled that probable cause existed once the dog alerted to the presence of drugs. It also indicated that the videotape alone gave the police probable cause to search.

At trial, the officers involved gave testimony that was generally consistent with the evidence adduced at the suppression hearing. Longshore was subsequently found guilty of possession of cocaine with the intent to distribute and was sentenced to fifteen years incarceration, the first ten of which were to be served without parole. An appeal to the Court of Special Appeals was noted by Long shore. That Court, in an unreported decision, affirmed the trial court judgment.

The Court of Special Appeals addressed the question, "Did the suppression court err in denying the appellant's motion to suppress the evidence seized from his vehicle and his person?" Longshore's argument was similar to the one he makes *sub judice*, namely, that, when he was handcuffed, he was effectively arrested, and that the police did not, at that time, have probable cause to effectuate a warrantless arrest. The State argued, in response, that the initial stop was simply a detention and that it was supported by reasonable articulable suspicion. Even if the detention constituted an arrest, it maintained, the police possessed probable cause to justify it. The Court of Special Appeals held that the stop was an arrest, not a detention, but concluded, ultimately, that the stop was supported by probable cause.

Longshore filed, in this Court, a petition for writ of certiorari, and the State filed a conditional cross-petition.[3] Both petitions were granted by this Court. *Longshore v. State*, 385 Md. 161, 867 A.2d 1062 (2005).

---

**3.** The Petitioner argues and, in doing so, provides the second issue in this case, that, "[a]ssuming an arrest, was probable cause lacking[?]" The State's conditional cross-petition, in response to Longshore's petition, strangely enough, actually forms the first issue in this case, that the Court of Special Appeals erred "in finding that the initial detention of Longshore amounted to an arrest. . . . "

## A.

When an appellate court reviews a trial court's grant or denial of a motion to suppress evidence under the Fourth Amendment, it will consider only the facts and information contained in the record of the suppression hearing. *State v. Nieves*, 383 Md. 573, 581, 861 A.2d 62, 67 (2004); *Laney v. State*, 379 Md. 522, 533, 842 A.2d 773, 779 (2004); *Dashiell v. State*, 374 Md. 85, 93, 821 A.2d 372, 376 (2003) *(quoting State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660, 663–64 (2002)); *Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420, 429 (2001).

An appellate court further will view the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the party prevailing on the motion, in this case, the State. *Nieves*, 383 Md. at 581, 861 A.2d at 67; *Laney*, 379 Md. at 533, 842 A.2d at 779; *Dashiell*, 374 Md. at 93, 821 A.2d at 376–77 *(quoting Collins*, 367 Md. at 707, 790 A.2d at 664); *Wilkes*, 364 Md. at 569, 774 A.2d at 429; *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990). Moreover, when there is a conflict in the evidence, an appellate court will give great deference to a hearing judge's determination and weighing of first-level findings of fact. It will not disturb either the determinations or the weight given to them, unless they are shown to be clearly erroneous. *Nieves*, 383 Md. at 581–582, 861 A.2d at 67; *Laney*, 379 Md. at 533–34, 842 A.2d at 779–80; *Dashiell*, 374 Md. at 93–94, 821 A.2d at 378; *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439, 444 (2003); *Riddick*, 319 Md. at 183, 571 A.2d at 1240; *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356, 358 (1990). *See* Rule 8–131.[4]

---

**4.** Maryland Rule 8–131 provides, as relevant:

"(a) Generally. The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

■ An appellate court, however, under an independent *de novo* review standard, must consider the application of the law to those facts in determining whether the evidence at issue was obtained in violation of the law, and, accordingly, should be suppressed. *Nieves,* 383 Md. at 581–582, 861 A.2d at 67; *Laney,* 379 Md. at 533–534, 842 A.2d at 779–780; *Dashiell,* 374 Md. at 93–94, 821 A.2d at 378, *Rucker,* 374 Md. at 207, 821 A.2d at 444; *Stokes v. State,* 362 Md. 407, 413–14, 765 A.2d 612, 615 (2001); *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999). Indeed, appellate courts make their "own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case." *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248, 253 (1996).

With this in mind, we turn to the case *sub judice.* The Court of Special Appeals held that, when Longshore was placed in handcuffs, he was effectively arrested. Having so held, it needed also to decide whether there was probable cause to support that arrest.

■ The power of the Court of Special Appeals, as an appellate court, is, like this Court's and any appellate court's, plenary; it is bound by the record in making those determinations, however. Making factual determinations, *i.e.* resolving conflicts in the evidence, and weighing the credibility of witnesses, is properly reserved for the fact finder. *See Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037, 1041 (1991); *McKinney v. State,* 82 Md.App. 111, 117, 570 A.2d 360, 363, *cert. denied,* 320 Md. 222, 577 A.2d 50 (1990). In performing this role, the fact finder has the discretion to decide which evidence to credit and which to reject. *See State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323, 331 (1998) ("Weighing the credibility of witnesses and resolving any conflicts in the evidence are

---

\* \* \* \*

"(c) Action Tried Without a Jury. When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."

tasks proper for the fact finder"). *See also Velez v. State*, 106 Md.App. 194, 202, 664 A.2d 387, 391 (1995), *cert. denied*, 341 Md. 173, 669 A.2d 1361 (1996).

The Court of Special Appeals did not err in deciding that the petitioner was arrested, rather than, as the trial court found, merely detained. As we shall see later, however, there was no substantial basis for its conclusion, if not finding, that probable cause existed when the petitioner was arrested.

## B.

The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . and no Warrants shall issue, but upon probable cause. . . ." U.S. Const. amend. XIV. *See also Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961), *Dashiell v. State*, 374 Md. 85, 94, 821 A.2d 372, 377 (2003), *Wallace v. State*, 373 Md. 69, 79, 816 A.2d 883, 889 (2003), *State v. Wallace*, 372 Md. 137, 145, 812 A.2d 291, 296 (2002). The Fourth Amendment is not a guarantee against all searches and seizures, however, only those that are unreasonable. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). *See also Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); *United States v. Mendenhall*, 446 U.S. 544, 550–51, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497, *reh'g denied*, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). *See also State v. Collins*, 367 Md. 700, 708, 790 A.2d 660, 664 (2002) *(quoting United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985), stating that the Fourth Amendment guards against "*unreasonable* searches and seizures"); *Little v. State*, 300 Md. 485, 494, 479 A.2d 903, 907 (1984) (holding that the reasonableness standard of constitutional validity of a seizure usually requires, at minimum, that facts upon which intrusion is based be capable of measurement against objective standard, whether this be probable cause or less stringent

test); *Givner v. State*, 210 Md. 484, 494–495, 124 A.2d 764, 769 (1956) (holding that prohibitions against unreasonable searches and seizures do not prohibit reasonable searches and seizures).

■ A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in an officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause. *United States v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598, 606 (1976), *see also Atwater v. Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549, 577 (2001) (stating "[i]f an officer has probable cause to believe an individual has committed even a very minor offense in his presence, he may, without violating the Fourth Amendment, arrest the offender"), *State v. Evans*, 352 Md. 496, 723 A.2d 423 (1999) (for lawful arrest for commission of felony to occur under Maryland law, police officer must have probable cause to believe suspect has committed a felony, and must either physically restrain suspect, or otherwise subject suspect to his or her custody and control), *Woods v. State*, 315 Md. 591, 556 A.2d 236 (1989) (warrantless arrest was proper, where police knew that felonious homicide had been committed and had received from several reliable sources defendant's statements, both before and after murder, which implicated defendant).

■ Moreover, "[p]robable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed [by the person to be arrested]." *Brinegar v. United States*, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311–1312, 93 L.Ed. 1879, 1890 (1949), *quoting Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925). *See also Anderson v. State*, 282 Md. 701, 387 A.2d 281 (1978) (invalidating an illegal search when the police lacked reasonable grounds to stop the suspects); *State v. Wilson*, 279 Md. 189, 367 A.2d 1223 (1977) (holding a search illegal when police observations were insuffi-

cient to support a probable cause determination that goods were stolen).

■ In Maryland, the perimeters of an arrest were defined in *Bouldin v. State*, 276 Md. 511, 350 A.2d 130 (1976). There, this Court opined:

"It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested.... It is said that four elements must ordinarily coalesce to constitute a legal arrest: (1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested....

"We have defined an arrest in general terms as the detention of a known or suspected offender for the purpose of prosecuting him for a crime. *McChan v. State*, 238 Md. 149, 207 A.2d 632 (1965); *Cornish v. State*, 215 Md. 64, 137 A.2d 170 (1957). Our cases make clear ... that in ordinary circumstances 'there is a detention only when there is a touching by the arrestor or when the arrestee is told that he is under arrest and submits[, but where] there is no touching, the intention of the arrestor and the understanding of the arrestee are determinative, for in order for there to be an arrest in such case, there must always be an intent on the part of one to arrest the other and an intent on the part of such other to submit.' 238 Md. at 157, 207 A.2d at 638. Ordinarily, therefore, there can be no arrest where there is no restraint or where the person sought to be arrested is not conscious of any restraint."

276 Md. at 515–516, 350 A.2d at 133 (some citations omitted). Thus, generally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest. *See Grier v. State*, 351 Md. 241, 252, 718 A.2d 211, 217 (1998) (holding that when the defendant was put "on the ground" he was under arrest), *Morton v. State*, 284 Md. 526, 530, 397 A.2d

1385, 1388 (1979) (holding that the defendant was arrested when he was removed from a building and placed in a patrol car under guard), and *Dixon v. State*, 133 Md.App. 654, 673, 758 A.2d 1063, 1073 (2000) (holding that defendant was arrested when his car was blocked in, he was removed, and then handcuffed). But *see Swift v. State*, 393 Md. 139, 156, 899 A.2d 867, 877 (2006) (holding that defendant not in custody and was free to leave even though a police car "merely" blocked the defendant's).

In *Grier*, 351 Md. 241, 718 A.2d 211, the issue in this Court concerned the propriety of the admission by the trial court of the defendant's post-arrest silence and whether, if that ruling was error, that error was harmless. The defendant was convicted in the Circuit Court for Baltimore City of attempted robbery with a deadly weapon, mayhem with the intent to disfigure, and other related offenses. He had been arrested after police officers, to whom it had been reported that Grier had attacked the man with whom he earlier was seen struggling and stolen that man's backpack, observed him enter a dead-end alley and throw something onto a porch. 351 Md. at 245, 718 A.2d at 213. When he exited the alley, the officers "got him and put him on the ground and then took him into custody." 351 Md. at 245, 718 A.2d at 213.

Addressing the nature and effect of the evidence elicited by the question, "What, if any explanation did the defendant offer to you [as to] why he was or why this was taking place?," *id.* at 251–52, 718 A.2d at 216, this Court observed:

"After Grier came out of the dead-end alley, the officers immediately arrested him. The officers pursued Grier, 'got' him, and put him on the ground. Once [Grier] was on the ground and in the custody and control of the police officers, he was certainly under arrest. *See Bouldin v. State*, 276 Md. 511, 515–16, 350 A.2d 130, 133 (1976). Although Officer Harley may have had the right simply to detain and question [Grier] before placing him in custody, he did not do so."

351 Md. at 252, 718 A.2d at 216–17.

*Morton* also involved the admissibility of challenged evidence. 284 Md. at 528, 397 A.2d at 1387. The defendant had

been convicted in the Criminal Court of Baltimore of robbery with a deadly weapon and a related handgun charge. *Id.* at 527, 397 A.2d at 1386–87. He was alleged to have been one of two men, each brandishing a gun, who robbed a cabdriver. 284 Md. at 528, 397 A.2d at 1387. One of the robbers escaped capture, while the other was apprehended. 284 Md. at 528, 397 A.2d at 1387.

The day following the robbery, officers, acting on information from a pharmacist, stopped the defendant and frisked him. 284 Md. at 528, 397 A.2d at 1387. At that time, the defendant was wearing a black leather jacket and carrying a plastic bag. 284 Md. at 528, 397 A.2d at 1387. Finding nothing, the officers told the defendant that he could leave, and he did; however, the officers kept the defendant under observation. 284 Md. at 528, 397 A.2d at 1387. Later, after receiving information that the defendant "may have been wanted for something," the officers surrounded a neighborhood recreation center that they saw him enter. 284 Md. at 528, 397 A.2d at 1387. An officer confronted the defendant inside the recreation center, informing the defendant of the information the police had received, 284 Md. at 528, 397 A.2d at 1387, and telling the defendant to accompany him, bringing all of his possessions, including the black leather jacket and plastic bag. 284 Md. at 528, 397 A.2d at 1387. When the defendant responded that those items had been given to his cousin who had left the recreation center, 284 Md. at 528, 397 A.2d at 1387, the officer, whose information was that no one had exited the recreation center since the defendant had entered, 284 Md. at 528, 397 A.2d at 1387, put the defendant in a patrol car with another officer. He then re-entered the recreation center to search for the jacket and the bag. 284 Md. at 528, 397 A.2d at 1387. The items were found and searched, revealing a handgun and a quantity of marijuana. 284 Md. at 528–529, 397 A.2d at 1387. The officer subsequently returned to the patrol car and informed the defendant that he was under arrest, after which the defendant was taken to police headquarters. 284 Md. at 529, 397 A.2d at 1387.

On this set of facts, this Court held:

"We think it clear that the appellant was arrested when Rice removed him from the recreation center and placed him under guard in the police patrol car. We said in *Bouldin v. State*, 276 Md. 511, 350 A.2d 130 (1976), that an arrest is the taking, seizing or detaining of the person of another, *Inter alia*, by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest. On the record before us, Rice's manual seizure of the appellant and the subsequent restraint of his liberty plainly constituted an arrest, there being nothing to show that the appellant voluntarily consented to the restrictions placed upon his freedom by the arresting officer."

284 Md. at 530, 397 A.2d at 1388.

In a case decided by the Court of Special Appeals, *Dixon v. State*, 133 Md.App. 654, 758 A.2d 1063 (2000), the defendant was convicted of possession of marijuana with intent to distribute. An informant's tip led Montgomery County police to search the trunk of a car driven by the defendant. Recovered as a result of that search were nine bags of marijuana. 133 Md.App. at 657, 758 A.2d at 1065. The informant, in addition to describing the car that the defendant would be driving, had told police that the defendant would be transporting ten pounds of marijuana to the second level garage at the Montgomery Mall at 8:15 pm that evening. 133 Md.App. at 659, 758 A.2d at 1066.

After preliminary surveillance of the defendant, during which photographs were taken, the police arrived at the parking garage. 133 Md.App. at 660, 758 A.2d at 1066. The defendant's car was already there, and at 8:15 pm, Dixon emerged from a side stairwell, walked in the direction of his vehicle, looked around "as if he was looking for someone," and exited the garage level by the way he had come. He returned a short time later, and got into his car. 133 Md.App. at 660, 758 A.2d at 1066. At that time, several police cars blocked in the defendant's car, 133 Md.App. at 660, 758 A.2d at 1066, and the defendant was removed from the car by the officers and handcuffed. 133 Md.App. at 660, 758 A.2d at 1066. The

defendant's car was searched without either a search warrant or the defendant's consent. 133 Md.App. at 660, 758 A.2d at 1066. Discovered, as a result of the search, were the nine gallon-size bags of marijuana. 133 Md.App. at 660, 758 A.2d at 1066.

The Court of Special Appeals, citing *Terry* and several cases that followed it, opined:

"As we see it, the events in the garage exceeded an investigatory stop under *Terry* and its progeny. Accordingly, we do not agree with either the State or the trial court that appellant was merely detained prior to the car search. Instead, we conclude that the officers arrested appellant at the time they blocked his car, removed him from h is vehicle, and handcuffed him."

133 Md.App. at 673–674, 758 A.2d at 1073, *citing Grier,* 351 Md. at 252, 718 A.2d at 216–217, *Morton,* 284 Md. at 530, 397 A.2d at 1388, *Wiegmann v. State,* 118 Md.App. 317, 330, 702 A.2d 928, 934 (1997).

▮▮▮ There are instances in which a person, who is not under arrest, may be detained. Without effecting an arrest, a police officer with reasonable suspicion, supported by articulable facts, that criminal activity "may be afoot," may stop and detain a person, briefly, for investigative purposes. *Terry,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968). *See also Nathan v. State,* 370 Md. 648, 661, 805 A.2d 1086, 1094 (2002), *Ferris v. State,* 355 Md. 356, 384, 735 A.2d 491, 506 (1999), *Derricott v. State,* 327 Md. 582, 587, 611 A.2d 592, 595 (1992), *State v. Lemmon,* 318 Md. 365, 377, 568 A.2d 48, 55 (1990).

▮▮▮ The reasonableness of a *Terry* stop is determined by considering "[w]hether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. Further, analysis of the scope of the stop requires balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley,* 469 U.S.

221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604, 611–612 (1985). *See also Quince v. State,* 319 Md. 430, 572 A.2d 1086 (1990) (holding that strong concerns for public safety and for effective crime prevention and detection clearly justify stop and frisk where there exists reasonable suspicion of ongoing or imminent criminal activity), *Jones v. State,* 319 Md. 279, 572 A.2d 169 (1990) (holding that an officer is entitled to make a forcible stop if the officer has reasonable grounds—he or she are able to point to specific and articulable facts that warrant such an intrusion—for doing so).

▮▮▮▮▮ Reasonable suspicion is, to be sure, a less demanding standard than probable cause. *United States v. Sokolow,* 490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10. *Stokes v. State,* 362 Md. 407, 765 A.2d 612 (2001), *Graham v. State,* 325 Md. 398, 601 A.2d 131 (1992), *Quince,* 319 Md. 430, 572 A.2d 1086, *Jones,* 319 Md. 279, 572 A.2d 169. In *Stokes,* we observed, in that regard:

> "While there is no litmus test to define the 'reasonable suspicion' standard, *see Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911, 918 (1996) (noting that it is impossible to articulate, with precision, what 'reasonable suspicion' means), it has been defined as nothing more than 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,' *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981); *see also Ornelas,* 517 U.S. at 695–96, 116 S.Ct. at 1661, 134 L.Ed.2d at 918, and as a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act. *See Ornelas,* 517 U.S. at 695, 116 S.Ct. at 1661, 134 L.Ed.2d at 918."

*Id.* at 415, 765 A.2d at 616. Thus, an investigatory stop typically is justified where there is some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. Stated differently, if, under the totality of the circumstances, a police officer has a particularized and objective basis for suspecting criminal activity by the person stopped, then the stop and temporary detention is justified.

*United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628 (1981), *Stokes,* 362 Md. 407, 413, 765 A.2d 612, 615, *Graham,* 325 Md. 398, 404, 601 A.2d 131, 134, *Quince,* 319 Md. 430, 434, 572 A.2d 1086, 1088, *Jones,* 319 Md. 279, 287, 572 A.2d 169, 173. Moreover:

> "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch".' The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause."

*Sokolow,* 490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d. at 10 (citations omitted). *See also Dashiell v. State,* 374 Md. at 97, 821 A.2d at 379 (holding that, in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience), *Derricott v. State,* 327 Md. 582, 593, 611 A.2d 592, 598 (1992) (requiring reasonable suspicion to be based on more than an "inchoate and unparticularized suspicion or 'hunch' ").

In addition to stops and brief detentions, other intrusive police actions are permitted when they are conducted in furtherance of the goal of protecting the safety of the officer. *See State v. Smith,* 345 Md. 460, 465, 693 A.2d 749, 751 (1997), *Graham,* 325 Md. 398, 408, 601 A.2d 131, 136, *Quince,* 319 Md. 430, 434, 572 A.2d 1086, 1088, *Jones,* 319 Md. 279, 283, 572 A.2d 169, 171. Pat-down searches, known commonly as frisks, "[are] not to discover evidence, but rather to protect the police officer and bystanders from harm." *Smith,* 345 Md. at 465, 693 A.2d at 751. Pat-down searches are allowed where the officer:

> ". . . has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has

probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

*Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (citations omitted).

As the Court of Special Appeals noted in its unreported opinion *sub judice,* the permissible scope of a *Terry* stop has expanded in the past few decades, allowing police officers to neutralize dangerous suspects during an investigative detention using measures of force such as placing handcuffs on suspects, placing the suspect in the back of police cruisers, drawing weapons, and other forms of force typically used during an arrest. *United States v. Tilmon,* 19 F.3d 1221, 1224–25 (7th Cir.1994). *See also In re David S.,* 367 Md. 523, 533, 789 A.2d 607, 613 (2002) (noting that in the three decades following the Supreme Court's decision in *Terry,* the permissible scope of a *Terry* stop has been expanded), *Aguilar v. State,* 88 Md.App. 276, 284, 594 A.2d 1167, 1171 (1991) (noting that "[t]he scope allowed for a Terry search has been expanded").

Nevertheless, Maryland has recognized very limited instances in which a show of force, such as placing a suspect in handcuffs, is not an arrest. This Court has upheld the use of such force when done to protect the officer, *see In re David S.,* 367 Md. 523, 789 A.2d 607 (2002), and the intermediate appellate court has upheld use of such force when done to prevent a suspect's flight, *see Trott v. State,* 138 Md.App. 89, 770 A.2d 1045 (2001). The specific circumstances of each of these cases informed the analysis in each of these cases.

In *In re David S.,* a juvenile defendant was adjudicated delinquent by the District Court of Maryland sitting in Mont-

gomery County as a juvenile court,[5] based on a finding that he possessed a controlled substance with the intent to distribute. Subsequently, an officer with the Rockville City Police Department was engaged in the surveillance of a house on Moore Drive, which was believed to be an open air drug market. 367 Md. at 529, 789 A.2d at 610. The officer spotted one, Hall, a suspected drug dealer, engage in a drug transaction, 367 Md. at 529, 789 A.2d at 610–611, but before officers could arrest him, the suspect fled into a house, as others dispersed. 367 Md. at 529, 789 A.2d at 611.

Later that same evening, the officer spotted Hall and David S., a juvenile, walking together on Ashley Avenue. When they stopped in front of an abandoned building, 367 Md. at 529–530, 789 A.2d at 611, David S. walked behind the building and, upon returning, he had an object, which he showed to Hall before stuffing it into the front waistband of his pants. 367 Md. at 530, 789 A.2d at 611. The officer believed that David S. had placed a handgun into his waistband. 367 Md. at 530, 789 A.2d at 611.

The officer radioed other officers to stop the individuals. 367 Md. at 530, 789 A.2d at 611. The officers, upon approaching David S. and Hall, drew their guns and ordered them to lie on the ground. 367 Md. at 530, 789 A.2d at 611. Neither suspect resisted. When a hard object was felt in the area of Davis S.'s waistband, the officers pulled out his tucked-in shirt

---

5. Previously, Montgomery County handled juvenile cases differently than any other jurisdictions in the State of Maryland. Maryland Code (1974, 1980 Repl.Vol., 1980 Supp.) § 3–801 of the Courts and Judicial Proceedings Article provided that in Montgomery County, juvenile matters would be tried in the District Court, while in the other twenty-two counties and Baltimore City, they would be tried in the Circuit Court. Section 3–801 read, at that time, as relevant:

"(h) Court-'Court' means the circuit court of a county or Baltimore City sitting as the juvenile court. In Montgomery County, it means the District Court sitting as the juvenile court."

That changed March 1, 2002, however. See 2001 Md. Laws Ch. 414. Maryland Code (1974, 2006 Repl.Vol.) § 3–801(i) of the Courts and Judicial Proceedings Article now provides:

"(i) 'Court' means the circuit court for a county sitting as the juvenile court."

and observed a black object protruding from his pants. 367 Md. at 530, 789 A.2d at 611. The object was removed from the waistband, and, upon inspection, was found to contain cocaine. 367 Md. at 530, 789 A.2d at 611.

David S. claimed that he was seized and arrested without probable cause. 367 Md. at 531, 789 A.2d at 611. The State claimed, to the contrary, that the permissible scope of the *Terry* stop had not been exceeded notwithstanding that the officers effected the stop utilizing a hard or forceful take down and handcuffing of David S. 367 Md. at 530, 789 A.2d at 611. Reviewing *Terry* and its progeny allowing hard take downs, this Court concluded:

> "In the case at bar, we hold that the police had reasonable suspicion, supported by articulable facts, to believe that [David S.] committed, or attempted to commit, a crime and that he had a gun in his waistband. [The officer] saw [David S.] and Hall engage in what appeared to be a burglary, and he saw [David S.] place a dark object, which looked like a handgun, in the front of his waistband. Therefore, the police were justified in conducting an investigatory stop of [David S.] and Hall.
>
> "We hold that the stop was a legitimate *Terry* stop, not tantamount to an arrest. Several police officers conducted a 'hard take down' of [David S.].... The officers, with their weapons drawn, forced [David S.] to the ground and placed him in handcuffs. This conduct was not unreasonable because the officers reasonably could have suspected that [David S.] posed a threat to their safety. Considering the totality of the circumstances, as they appeared to the officers at the time, in order to maintain their safety, handcuffing [David S.] and placing him on the ground for a brief time was reasonable and did not convert the investigatory stop into an arrest under the Fourth Amendment. Although this is a severe form of intrusion, we conclude that under the circumstances, it was reasonable."

367 Md. at 539–540, 789 A.2d at 616.

In *Trott*, the defendant was stopped by a police officer, when the officer noticed him, shortly after hearing a loud

crash, pushing a woman's bicycle, "with a 'kid's tote . . . attached to the back'" and containing a number of items, including a snowblower, weedwacker, tire, and tow hitch, towards him. 138 Md.App. at 94–95, 770 A.2d at 1048. When the officer approached the defendant and asked what happened, 138 Md.App. at 95, 770 A.2d at 1048, the defendant explained that his car had broken down and that he did not wish to leave his belongings behind. 138 Md.App. at 95, 770 A.2d at 1048. The officer recognized the defendant's name, given at the officer's request, as someone who had been involved in numerous break-ins in the past. 138 Md.App. at 95, 770 A.2d at 1048. Moreover, when he radioed for backup, he was informed to "be careful" because the defendant "was wanted and to hold him, because he was going to run." 138 Md.App. at 95, 770 A.2d at 1048.

As the field interview progressed, the defendant became more "nervous" and "jittery." Worried that the defendant may have heard his radio transmission, the officer placed the defendant in handcuffs for, as he put it, "his and my safety." 138 Md.App. at 95–96, 770 A.2d at 1049. A warrant check revealed what he had been told, that there was an outstanding arrest warrant for the defendant. 138 Md.App. at 96, 770 A.2d at 1049. Thereafter, twelve minutes after first approaching him, the defendant was placed under arrest. 138 Md.App. at 96, 770 A.2d at 1049.

The defendant claimed that, even if the initial stop was justified, his being handcuffed turned the stop into an arrest that was not supported by probable cause. 138 Md.App. at 118, 770 A.2d at 1061–1062. The Court of Special Appeals disagreed. First, it noted that "the handcuffing of [the defendant] was justifiable as a protective and flight preventive measure pursuant to a lawful stop and did not necessarily transform that stop into an arrest." 138 Md.App. at 118, 770 A.2d at 1062.[6]

---

**6.** The intermediate appellate court relied on federal and state authorities: *United States v. Jones,* 973 F.2d 928, 931 (D.C.Cir.1992) (use of handcuffs during a stop after defendant attempted to run was reason-

The intermediate appellate court held that, under the factual circumstances surrounding the defendant's detention, the police officer's use of handcuffs was appropriate. 138 Md.App. at 120, 770 A.2d at 1063. It reasoned that the facts that the defendant was known to be involved in "break-ins," that the officer was warned by other officers that the defendant would run, and that the defendant had become increasingly "nervous" and "jittery" were a sufficient basis to allow the officer,

---

able), *United States v. Crittendon,* 883 F.2d 326, 329 (4th Cir.1989) (handcuffing burglary suspect to prevent flight was reasonable during investigative stop), *United States v. Gil,* 204 F.3d 1347, 1351 (11th Cir.2000) (use of handcuffs on a female suspect was reasonable when there was no female officer to perform a pat down and where officers were uncertain if the suspect was armed), *United States v. Campbell,* 178 F.3d 345, 349 (5th Cir.1999) (handcuffing suspect who police feared was armed was reasonable), *Washington v. Lambert,* 98 F.3d 1181, 1186 (9th Cir.1996) (pointing a weapon at a suspect and handcuffing him will not automatically convert a stop into an arrest when the suspects are feared to be armed and dangerous), *United States v. Shareef,* 100 F.3d 1491, 1502 (10th Cir.1996) (where suspects were wanted for armed robbery, use of handcuffs and firearms does not necessarily transform a stop into an arrest), *United States v. Smith,* 3 F.3d 1088, 1096 (7th Cir.1993) (no unreasonable search occurred when police believed suspects to be armed), *United States v. Saffeels,* 982 F.2d 1199, 1205 (8th Cir.1992) (handcuffing suspect does not convert stop into arrest when defendant suspected of being armed), and *United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir.1982) (handcuffing appropriate in investigative stop when suspect is flight risk); *Hicks v. United States,* 730 A.2d 657, 660 (D.C.1999) (handcuffing suspects permissible to secure the safety of the officers), *People v. Foster,* 85 N.Y.2d 1012, 1014, 630 N.Y.S.2d 968, 654 N.E.2d 1216 (1995) (handcuffing of suspect was lawful when suspect fled upon seeing an officer), *Howard v. State,* 664 P.2d 603, 606 (Alaska Ct.App.1983) (handcuffs and drawn guns did not turn stop into an arrest where suspects were armed and one fled upon seeing an officer), *Reynolds v. State,* 592 So.2d 1082, 1085 (Fla.1992) (placing a suspect in handcuffs allowed during detention where violent resistance was expected), *State v. Du Valt,* 131 Idaho 550, 553, 961 P.2d 641, 644 (1998) (handcuffing suspect during stop was allowable to secure the officers' safety), *State v. Reid,* 135 N.H. 376, 379, 605 A.2d 1050, 1051 (1992) (handcuffing allowed to detain agitated suspect during investigative stop until identification could be made), *Spenner v. City of Sioux Falls,* 580 N.W.2d 606, 609 (S.D.1998) (handcuffing of suspect during stop was reasonable when officers suspected that defendant was armed), *State v. Wheeler,* 108 Wash.2d 230, 235, 737 P.2d 1005, 1008 (1987) (handcuffing appropriate to secure officers' safety).

who was alone and on foot, to handcuff the defendant. 138 Md.App. at 120–121, 770 A.2d at 1063.

The Court of Special Appeals warned, however:

"This is not to suggest that every time a police officer handcuffs a suspect that that restraint is not an arrest. In fact, in most instances, placing a suspect in handcuffs does amount to an arrest, which must then be supported by probable cause."

*Id.* at 121, 770 A.2d at 1063–64, *citing In re David S.*, 135 Md.App. 363, 369, 762 A.2d 970 (2000); *Dixon v. State*, 133 Md.App. 654, 673, 758 A.2d 1063 (2000).

■■ The petitioner argues, as he did in the Court of Special Appeals, that, when he was asked to step out of the car and placed in handcuffs before the drug dog's second scan, he was effectively arrested. Like the Court of Special Appeals, we agree with this argument. Having reviewed *Grier*, *Morton*, *Dixon*, *In re David S.*, and *Trott* in context, we hold that Longshore was arrested when he was asked to step out of the car and placed in handcuffs, and that *no special circumstances existed* that justified the police officers placing him in handcuffs. The officers conceded that he was stopped because they believed him to possess drugs. Unlike the circumstances in *In re David S.*, there was no suspicion that a violent crime had occurred, nor any reason to believe that Longshore was armed or dangerous. The arresting officer acknowledged that, despite Long shore's nervousness, he was cooperative and did not exhibit any threatening behavior. The officers did not indicate that they were, in any way, concerned for their safety. Moreover, there was no reason to believe that Longshore was a flight risk. There was no indication by the police that they believed, nor any objective basis for concluding, that Longshore would run. In addition, the incident occurred in the middle of the day, not at 3:30 a.m. as in *Trott*. We agree with the Court of Special Appeals that:

"There was no evidence elicited at the suppression hearing that the police handcuffed appellant because of safety or flight concerns. Detective Edge testified that appellant was

cooperative, and there was no evidence suggesting that he was a flight risk. Without more, we agree with appellant that when he was handcuffed, the police had effectuated an arrest."

Because Longshore was neither a flight nor safety risk, there was no justification for placing Longshore in handcuffs. This was, therefore, no mere detention; it was, in fact, an arrest. Consequently, to be a valid arrest, probable cause was required.

Accordingly, we reject the State's argument that the arrest was nothing more than a detention. The State contends that "[a] step-by-step analysis of the circumstances shows that the police initially conducted a brief detention, or *Terry* stop, that was justified by the reasonable suspicion that Longshore had drugs in his vehicle and arrested him when the drug detection dog alerted to the presence of drugs in the vehicle." The State asserts that a "totality of the circumstances" analysis should apply. *In re David S.*, 367 Md. at 535, 789 A.2d at 614.

Citing *In re David S.* for the proposition that neither handcuffing nor pointing a gun at a suspect necessarily transforms a stop into an arrest, 367 Md. at 535, 789 A.2d at 614, the State notes that the police are permitted to take "reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed." 367 Md. at 535, 789 A.2d at 614, *citing United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir.1990) (holding that the defendant was not under arrest when the officers approached his vehicle with guns drawn and ordered him out of the car). While we agree that reasonable measures can be used to neutralize harm, we have already concluded that, and explained why, *In re David S.* is inapposite. Longshore was suspected neither of being dangerous nor of being armed.

The State's reliance on *Farrow v. State*, 68 Md.App. 519, 514 A.2d 35 (1986), also is unavailing. The distinction between a *Terry* stop and an arrest is not defined simply by the length of detention, the investigative activities during the detention, and whether the suspect was removed to a deten-

tion or interrogation area. Indeed, despite the changes in the contours of the *Terry* doctrine, there currently still are no bright lines to determine when an investigatory stop and frisk becomes an arrest and is elevated to the point that probable cause is required. *See Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575, 84 L.Ed.2d at 615–616 (concluding that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria," and that "[a] court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second guessing"). Instead, *Terry* dictates that each detention be evaluated within the factual circumstances of individual cases. 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910. *See State v. Smith,* 345 Md. at 468, 693 A.2d at 753 (noting that the reasonableness of a *Terry* stop and frisk must be "assessed on a case-by-case basis").

In *Farrow,* the police set up surveillance on a jewelry store property that had been robbed by two African–American men, and, over the course of two days, observed two men, one of whom was the defendant Farrow, acting suspiciously, walking and driving back and forth in front of the store. 68 Md.App. at 521–522, 514 A.2d at 36. Using binoculars, police noticed a "bulge" underneath Farrow's shirt. 68 Md.App. at 522, 514 A.2d at 36. They thereafter surrounded Farrow's car at an intersection, approached the car with guns drawn, opened the door, pulled Farrow face down on the pavement, and handcuffed him. 68 Md.App. at 522, 514 A.2d at 36. A search of the car yielded a .32 caliber handgun. 68 Md.App. at 522, 514 A.2d at 36.

Farrow argued that, even if the stop were justified, the means used to detain him were unreasonable, and converted the stop into an arrest that lacked probable cause. 68 Md. App. at 524, 514 A.2d at 37. The Court of Special Appeals noted that, when justified by the circumstances, flexible police responses are appropriate while conducting a *Terry* stop. 68 Md.App. at 525, 514 A.2d at 37–38, *citing, e.g., Hensley,* 469

U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (police approaching suspect's car with guns drawn), *United States v. Taylor,* 716 F.2d 701 (9th Cir.1983) (officers approached car with drawn guns, ordered uncooperative suspect to lie in ditch, and hand-cuffed him did not transform the stop into an arrest). On the question of Farrow's arrest, the intermediate appellate court opined:

"The distinction between a *Terry* 'stop' and an arrest, then, is not in the *method* of detention, but rather has to do with the length of the detention, the investigative activities dur-ing the detention, and whether the suspect is removed to a detention or interrogation area. . . .

\* \* \* \*

". . . we hold that, in this situation, where police were facing men that were strongly suspected of being armed robbers, the officers were justified in taking complete control of the situation for that period of time necessary to accomplish the 'frisk.' The need for further investigation was pre-empted when an illegal handgun turned up within the lawful perime-ters of the 'frisk.' "

68 Md.App. at 526–527, 514 A.2d at 38–39.

The State does not explain how this case is any different than *Trott* or *In re David S.* We have already confirmed that police officers, in certain situations, such as those evidencing the need for officer safety and to prevent flight, have authori-ty, albeit limited authority, to use force to enforce a stop. Neither of those circumstances is present in the case *sub judice. Farrow,* therefore, is inapplicable, as Longshore was not suspected of being armed and, unlike in *Farrow,* an illegal handgun was not later discovered, thus providing some vali-dation for any suspected dangerousness. Nor is *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988) helpful. This Court permit-ted a hard take down where the defendant had been suspected of murder and was believed to be carrying a concealed weap-on. Neither factor is present in the case *sub judice.*

The State also cites *Ferris v. State,* 355 Md. 356, 376, 735 A.2d 491, 501 (1999), for the proposition that no one factor is

dispositive under a "totality of the circumstances" analysis. This Court, however, while acknowledging, in that case, that the facts of each case are different resulting in there never being one particular factor that is dispositive, also opined that there *did* exist certain factors of which courts could take note that would be probative of the question whether the police action was reasonable:

"Although the inquiry is a highly fact-specific one, courts have identified certain factors as probative of whether a reasonable person would have felt free to leave.... These factors include: the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave."

355 Md. at 377, 735 A.2d at 502.

The State ultimately argues that "[u]nder the totality of circumstances here, where Longshore was placed in handcuffs for several minutes pending the arrival and the scanning of the vehicle by the drug detection dog; where Longshore appeared to be 'extremely nervous,' and the police were aware of Longshore's prior drug arrests, the actions of the police were reasonable." This argument is unavailing. First, as already noted, Longshore was not a flight risk nor was he considered dangerous. There was no reason to put him in handcuffs while awaiting the drug detection dog's arrival. Moreover, this Court has cautioned against, "placing too much reliance upon a suspect's nervousness when analyzing a determination of reasonable suspicion." *Ferris,* 355 Md. at 389, 735 A.2d at 509 (citations omitted). Finally, this Court has also stated:

"Prior drug arrests do not necessarily yield reasonable suspicion that an individual is secreting weapons or drugs

on his person at the time of his arrest on a drug offense, because to allow the reasonable, articulable suspicion standard to be satisfied based upon a person's status, rather than an individualized assessment of the circumstances, would undermine the purpose for requiring officers to justify their reasons for searching a particular individual."

*Nieves*, 383 Md. at 597, 861 A.2d at 77.[7]

Penultimately, the cases that the State cites for the proposition that it was reasonable for officers to assume that, "where

---

7. None of the cases that the State cites from federal and state jurisdictions regarding the reasonable use of physical force in a detention is applicable here, as, in each case, the suspect was suspected of being either armed and dangerous, or a flight risk, circumstances that do not exist *sub judice*. *See United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir.1989) (where defendant was handcuffed and searched for a weapon after co-suspect attempted to flee from the police), *United States v. Jones*, 973 F.2d 928, 929 (D.C.Cir.1992) (where was handcuffed and put into a police car after defendant ostensibly walked in one direction to obtain student identification and suddenly "took off running"), *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir.2000) (where the trial court allowed a detention where defendant was handcuffed and placed in a police car because officers were concerned for their safety and a female officer was not available to search defendant for weapons), *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir.1999) (where defendant was handcuffed where he was suspected of armed robbery and surveillance revealed that defendant might be armed), *Washington v. Lambert*, 98 F.3d 1181, 1183 (9th Cir.1996) (where police drew guns and handcuffed two men suspected of committing armed robbery), *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir.1996) (where suspects handcuffed were known to be "armed and dangerous"), *United States v. Smith*, 3 F.3d 1088, 1096 (7th Cir.1993) (where the trial court allowed handcuffing of defendants because of safety concerns, given the time of night, the general environment of the investigation and the nature of the alleged offenses, noting also one defendant's prior involvement in an armed robbery), *United States v. Saffeels*, 982 F.2d 1199, 1202 (8th Cir.1992) (where defendant was handcuffed because he was suspected of armed robbery and a large knife was seen inside his car), *United States v. Bautista*, 684 F.2d 1286, 1287 (9th Cir.1982) (where defendants were handcuffed under suspicion of armed robbery), *Hicks v. United States*, 730 A.2d 657, 658 (D.C.1999) (where defendants were handcuffed under suspicion of armed robbery and where a sawed off shotgun was discovered in their vehicle), *People v. Foster*, 85 N.Y.2d 1012, 1014, 630 N.Y.S.2d 968, 654 N.E.2d 1216 (1995) (where suspect was handcuffed after he ran upon seeing a police officer), *Howard v. State*, 664 P.2d 603, 606 (Alaska Ct.App.1983) (where defendants handcuffed were wanted for violent assaults and where, upon seeing police

drugs are, weapons are as well," are negated by the State's evidence, the testimony of the police officers, that Longshore was not suspected of a violent crime and that he did not exhibit violent behavior.

Finally, the State questions the applicability of *Grier*, noting that the issue of the validity of the arrest was not the paramount issue in the case. It finds *Morton* similarly unhelpful, noting that it is factually distinguishable. The State also points out that the Court of Special Appeals discussion of the arrest issue in *Dixon* was largely dicta and not central to the case.

We reject these arguments. We hold that, notwithstanding some factual differences to the case *sub judice*, *Grier*, *Morton*, and *Dixon* each provide the appropriate model for determining "when" someone is arrested.

## C.

When there is a conflict in the evidence, an appellate court will give great deference to a hearing judge's first-level factual and credibility determinations. *See, e.g., Nieves*, 383 Md. at 581–582, 861 A.2d at 67, *Laney*, 379 Md. at 533–534, 842 A.2d at 779–780. Findings of fact and credibility determinations are to be made by trial courts, not appellate courts.

---

officers, co-suspect grabbed a gun and ran away), *Reynolds v. State*, 592 So.2d 1082, 1084 (Fla.1992) (where defendant was handcuffed for police safety based on officer's previous experience of violent resistance during cocaine trafficking busts, further holding that, once safety concern had passed, continued use of handcuffs was illegal), *State v. DuValt*, 131 Idaho 550, 553, 961 P.2d 641, 644 (1998) (where the court found reasonable the use of handcuffs during a detention based on officers' belief that the occupants of the car could pose a danger to the officers' safety), *State v. Reid*, 135 N.H. 376, 379, 605 A.2d 1050, 1051 (N.H.1992) (where defendant was handcuffed during detention after he became angry, agitated, and began yelling at officers, where the officers believed that handcuffing was necessary for safety purposes), *Spenner v. City of Sioux Falls*, 580 N.W.2d 606, 609 (S.D.1998) (where police handcuffed defendant suspected of armed robbery during investigatory detention), *State v. Wheeler*, 108 Wash.2d 230, 233, 737 P.2d 1005, 1006 (1987) (where police handcuffed a suspect who was seen running from a crime scene during an investigatory detention).

*See State v. Green,* 375 Md. 595, 607, 826 A.2d 486, 493 (2003). Conclusions of law, while permissibly drawn by the trial courts, are not entitled to the same deference. *Ferris,* 355 Md. at 368, 735 A.2d at 497. The probable cause determination is neither entirely a factual determination nor a question of law; rather, it is a mixed question of fact and law, *see Whiting v. State,* 389 Md. 334, 345, 885 A.2d 785, 791 (2005), an application of the applicable law to the facts, as found. *Green,* 375 Md. at 607, 826 A.2d at 493.

The proposition that a trial court's determination of whether there is probable cause is entitled to great deference from a reviewing court was stated in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates,* the Supreme Court said, on this point:

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed."

462 U.S. at 238–239, 103 S.Ct. at 2332, 76 L.Ed.2d at 548, *citing Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697, 708 (1960).

This Court recently repeated this standard:

"The applicable standard of review of a probable cause determination is: 'so long as the magistrate had a substantial basis for [ ] concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment [of the U.S. Constitution] requires no more.' "

*Abeokuto v. State,* 391 Md. 289, 338, 893 A.2d 1018, 1046 (2006), *citing Potts v. State,* 300 Md. 567, 571, 479 A.2d 1335, 1337–38 (1984) (Internal quotations and citations omitted). *See also Williams v. State,* 342 Md. 724, 755–756, 679 A.2d 1106, 1122 (1996) (holding that appellate review of probable

cause determination, made in connection with issuance of search warrant, is limited to determining whether issuing magistrate had a substantial basis for concluding that search would uncover evidence of wrongdoing), *Minor v. State*, 334 Md. 707, 716, 641 A.2d 214, 218 (1994) (restating the Gates standard).[8] *See also Birchead v. State*, 317 Md. 691, 701, 566 A.2d 488, 492–493 (1989), in which we opined:

> "Our review of the judge's decision to issue the search warrants is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described in the application for the warrant. . . . Moreover, we generally pay great deference to a magistrate's determination of probable cause. (Citations omitted)."

Deference to probable cause determinations, so long as there is a substantial basis for the finding, has been discussed and accepted by the Court of Special Appeals, as well. In *State v. Blackman*, 94 Md.App. 284, 617 A.2d 619 (1992), a stop and frisk case, the intermediate appellate court, addressing the level of appellate scrutiny that applies to a decision of a suppression hearing judge, explained:

> "To the extent to which the suppression hearing judge was called upon to make findings of first-level fact and to assess the credibility of Officer Matthews, and others, those are

---

**8.** We have addressed mixed questions fact and law in the administrative law context, stating:

> " . . . [w]hen the agency decision being judicially reviewed is a mixed question of law and fact, the reviewing court applies the substantial evidence test, that is, the same standard of review it would apply to an agency factual finding."

*Charles County Dept. Of Social Services v. Vann*, 382 Md. 286, 855 A.2d 313 (2004), *citing Pollock v. Patuxent*, 374 Md. 463, 469 n. 3, 823 A.2d 626, 630 n. 3 (2003); *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 837–38, 490 A.2d 1296, 1302–03 (1985), as has the Court of Special Appeals, *Kohli v. LOOC, Inc.*, 103 Md.App. 694, 654 A.2d 922 (1995), *rev'd in part on other grounds and remanded*, 347 Md. 258, 701 A.2d 92 (1997); *Strother v. Board of Education*, 96 Md.App. 99, 623 A.2d 717 (1993). *See also Department of Human Resources v. Howard*, 168 Md.App. 621, 669, 897 A.2d 904, 931 (2006) (holding that a reviewing court extends the same deference to an administrative law judge on mixed questions as it does on pure questions of fact).

decisions that the suppression hearing judge is at a vantage point to make far more competently than we. Those are decisions, therefore, to which we, on appellate review, extend great deference and reverse only when they, as a matter of law, are clearly erroneous. No such problem is involved in this case.

"Once credibility has been assessed and first-level findings of fact have been made, such as who did what to whom and when, a very different issue emerges. It is a mixed question of law and fact. The issue is that of what significance shall be given to the first-level facts as found. That is a question as to which all reviewing judicial tribunals-the suppression hearing court, the trial court, and the appellate court alike-are called upon to exercise an appellate-like discipline. At none of those levels of review will the court presume to decide, as if it were on the street, whether articulable suspicion existed. A reviewing court, at whatever level, will not second-guess that initial decision that had to be made and that then became the object of judicial scrutiny. By analogy to the review of probable cause determinations made by an officer on the street, we hold that the reviewing court, trial and appellate alike, must make the far more deferential determination of whether the officer had a substantial basis for concluding that articulable suspicion existed."

94 Md.App. at 292–293, 617 A.2d at 623.

This deference was employed in overturning a state appellate decision in *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). In *Pringle*, a passenger car in which three men were riding was stopped for speeding in the early morning. 540 U.S. at 368, 124 S.Ct. at 798, 157 L.Ed.2d at 773. When the officer asked the driver for his license and registration, he observed a very large amount of rolled-up money in the car's glove compartment. 540 U.S. at 368, 124 S.Ct. at 798, 157 L.Ed.2d at 773. A license and registration check for outstanding violations revealed nothing. 540 U.S. at 368, 124 S.Ct. at 798, 157 L.Ed.2d at 773. Nevertheless, the officer had the driver step out of the car, 540 U.S. at 368, 124

S.Ct. at 798, 157 L.Ed.2d at 773, and subsequently asked the driver for, and received, permission to search the car. 540 U.S. at 368, 124 S.Ct. at 798, 157 L.Ed.2d at 773. The search uncovered, wedged behind the upright armrest in the back seat, $763 and five glassine bags containing cocaine. 540 U.S. at 368, 124 S.Ct. at 798, 157 L.Ed.2d at 773–774. When no one claimed ownership of the cocaine and the cash, all three people in the car were placed under arrest and taken to the police station. 540 U.S. at 369, 124 S.Ct. at 798, 157 L.Ed.2d at 774. Pringle, one of the passengers in the car, was seated in the front seat. He moved to suppress the evidence, arguing that any evidence obtained has resulted from an illegal arrest unsupported by probable cause. 540 U.S. at 369, 124 S.Ct. at 799, 157 L.Ed.2d at 774. His motion was denied by the trial court, and he was convicted. 540 U.S. at 369, 124 S.Ct. at 799, 157 L.Ed.2d at 774. The Court of Special Appeals, holding that there was probable cause at the time of the arrest, affirmed his conviction. 540 U.S. at 369, 124 S.Ct. at 799, 157 L.Ed.2d at 774.

This Court reversed, holding that, absent specific facts tending to show Pringle's knowledge, dominion, and control over the drugs, "the mere finding of cocaine in the back armrest when [Pringle] was a front seat passenger in a car driven by its owner is insufficient to establish probable cause for an arrest of possession." *Pringle v. State,* 370 Md. 525, 545, 805 A.2d 1016, 1027 (2002). We reviewed the trial court's probable cause determination *de novo. Id.*

The Supreme Court reversed. It first articulated the applicable standard for review of probable cause determinations, noting that "[p]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules . . . . it deals with probabilities and depends on the totality of the circumstances." 540 U.S. at 370–371, 124 S.Ct. at 799–800, 157 L.Ed.2d at 775 (internal quotations and citations omitted). *See also Woods v. State,* 315 Md. at 611, 556 A.2d at 246 (whether an arrest for a felony without a warrant is constitutionally valid necessarily turns upon whether, at the moment

the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information sufficient to warrant a prudent man in believing that the accused had committed or was committing a felony).

Focusing on the totality of the circumstances as existed in *Pringle*, the Supreme Court concluded that it was entirely reasonable for the fact finder to infer that any or all three passengers in the car had knowledge, dominion, and control of the drugs. 540 U.S. at 372, 124 S.Ct. at 800–801, 157 L.Ed.2d at 776. In other words, the Supreme Court held, consistent with its holding in *Gates*, that the trial court had a substantial basis for concluding that there was probable cause. But *see State v. Rucker*, 374 Md. 199, 821 A.2d 439 (2003); *Swift v. State*, 393 Md. 139, 899 A.2d 867 (2006).[9]

---

**9.** In *State v. Rucker*, 374 Md. 199, 821 A.2d 439 (2003), based on a tip that the respondent Rucker was involved in drug trafficking, police parked behind Rucker as he was getting into his own parked vehicle in a shopping center parking lot. 374 Md. at 202, 821 A.2d at 441. Two more officers approached and questioned Rucker with regard to whether he possessed "anything he was not supposed to have." 374 Md. at 202–203, 821 A.2d at 441. Thus confronted, Rucker admitted possessing cocaine, and was arrested. 374 Md. at 202–203, 821 A.2d at 441. He moved to suppress his admission, arguing that the police had not given him warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before making their inquiries. 374 Md. at 203, 821 A.2d at 441. A divided Court held that Rucker was not in "custody," 374 Md. at 203, 821 A.2d at 441, relying mainly on the Supreme Court's decision in *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), a case in which the Supreme Court held that "routine traffic" stops, because of their similarity to *Terry* stops, rather than arrests, did not require *Miranda* warnings, 468 U.S. at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 334–335.

Pursuant to *Berkemer*, this Court "reweighed" the facts and circumstances of the case differently than the trial court, characterizing the exchange between the respondent and the police as a request, rather than, as the trial court had found, a demand, and concluded that Rucker's freedom of movement was not hindered in any way. Therefore, we held that there could not have been a formal arrest. 374 Md. at 220–221, 821 A.2d at 452.

This holding did not accord the trial court finding any deference; it certainly did not address, or seek to assess "how a reasonable man ... would have understood the situation." *Berkemer*, 468 U.S. at 441–42, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. The dissent noted:

"... because there was no actual arrest until after the recovery of the cocaine, the question to be answered was whether the circumstances were such that a reasonable person would have felt that he or she was in custody. After, evaluating the testimony adduced at the hearing, the trial judge found that the respondent was in custody, thus either rejecting that which supported that he was not or drawing inferences from the evidence that supported the factual conclusion that the trial judge made. Put another way, the trial judge found that the officers' conduct in the parking lot exceeded the scope of an investigatory stop under *Terry*, and was, in actuality, a de facto arrest, thus triggering the respondent's entitlement to *Miranda* warnings. The trial court's determination is entitled to deference and, in any event, should not easily be ignored.

"Although it professes to do so, the majority fails to accept the trial court's findings of fact and, in fact, views the sequence of events surrounding the respondent's arrest quite differently than did the trial court...."

374 Md. at 229, 821 A.2d at 456–457 (Bell, C.J., dissenting).

Furthermore:

"Notwithstanding that they are never determined to be clearly erroneous, the majority all but ignores, and certainly does not apply, the facts as found by the trial court, and undoubtedly critical to its determination that the stop was tantamount to an arrest ..."

374 Md. at 231, 821 A.2d at 458 (Bell, C.J., dissenting).

In contrast, in *Swift v. State*, 393 Md. 139, 899 A.2d 867 (2006), the Court took a different approach. There, the petitioner Swift was walking down the street, and a police officer, suspicious of his behavior and presence in a "high crime area," and after circling him three times, brought his police cruiser, with his lights shining on Swift, to rest directly in front of Swift, blocking his path. After an exchange in which the police officer asked Swift if he could search him, Swift fled the scene, only to be caught eventually and arrested. 393 Md. at 147, 899 A.2d at 871. Swift moved to suppress the evidence recovered as a result of the subsequent search of his person, arguing that he had been illegally detained when he was stopped. He maintained, in that regard, that when stopped, he was not free to leave. 393 Md. at 147, 899 A.2d at 872. The Circuit Court denied the motion, finding that, under the facts, a reasonable person would have felt free to leave. 393 Md. at 147, 899 A.2d at 872.

This Court, in contrast, and unlike in *Rucker*, acknowledged that trial courts are in the best position to resolve questions of fact, while also noting that legal conclusions, such as whether a reasonable person would have felt free to leave, can be reviewed *de novo*, after giving due weight to the factual findings made by the trial court:

"Our review of the circuit court's denial of a motion to suppress is based on the record created at the suppression hearing. Review of the trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. The trial court is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. An appellate court reviews the trial court's findings of fact only for clear error, giving due weight to the inferences fairly drawn by the trial court. The legal conclusions, however, are not afforded

Thus, *Pringle* dictates that the relevant inquiry is whether the "particular factual contexts," 540 U.S. at 371, 124 S.Ct. at 800, 157 L.Ed.2d at 775, available in this case contribute to a valid finding of probable cause under the "totality of the circumstances." 540 U.S. at 371, 124 S.Ct. at 800, 157 L.Ed.2d at 775.

▮ Applying *Gates* and *Pringle*, the standard of review in a probable cause determination is clear. A trial court's probable cause determination is entitled to deference, and, if the appellate court determines that there is a substantial basis for the trial court to have concluded, as it did, that there was probable cause, the trial court's determination will not be disturbed. If, on the other hand, the appellate court concludes that there is no such basis, then there is no probable cause. *See Swift v. State*, 393 Md. 139, 155, 899 A.2d 867, 876 (2006). This Court's scope of review of the probable cause decision of the Court of Special Appeals is neither wider nor narrower than that applicable to that court's review of the same decision by a trial court. In this case, the intermediate appellate court's decision is the first occasion on which the circumstances of the petitioner's arrest and the subsequent search of his vehicle and his person were subjected to a probable cause analysis.[10]

▮ In the case *sub judice*, we hold that, necessarily, having determined that no arrest occurred when Detective

---

deference, and are reviewed *de novo*. The conclusion of the trial court as to whether a seizure has occurred for Fourth Amendment purposes is a question of law, reviewed *de novo* by this Court." 393 Md. at 154–155, 899 A.2d at 876 (citations omitted).

Acknowledging that "[w]hether a reasonable person would have felt free to leave police presence is a highly fact-specific inquiry," this Court, based on the factual testimony given at trial, concluded that a reasonable person would not have felt free to walk away under the circumstances. 393 Md. at 156, 899 A.2d at 877.

10. The trial court's analysis, as we have seen, was on the basis of a detention and the concomitant reasonable suspicious standard. To be sure, it did opine that the video-tape, by itself, was sufficient to constitute probable cause; however, in context and logically, that determination does not pass the substantial basis test.

Edge stopped Longshore, the trial court did not have a substantial basis for determining that probable cause existed at the time that he was handcuffed. The suppression court viewed Longshore's stop, when he was handcuffed, not as an arrest, but as a detention that only required reasonable suspicion, which was supplied, it opined, by the videotape and the drugs, marijuana and trace amounts of cocaine, found in Carlson's car. Probable cause, the court noted, existed once the drug dog alerted to the presence of drugs. Interestingly, and somewhat inconsistently, the suppression court also noted that the videotape alone was sufficient to establish probable cause to search the petitioner's vehicle.

As we have seen, the Court of Special Appeals held that an arrest had occurred. The question that must be resolved is whether, in light of that holding, that court had a substantial basis to determine the existence of probable cause. The intermediate appellate court affirmed the petitioner's conviction, but it did not do so on the ground on which the trial court relied; it did not accept the trial court's analysis with regard to the nature o f the petitioner's stop and detention. In fact, the Court of Special Appeals rejected the trial court's characterization of the petitioner's stop as a mere detention, holding, instead, that it was an arrest, for the justification of which probable cause was required to be shown.

Nevertheless, the intermediate appellate court concluded that there was probable cause to justify the arrest.[11] That

---

11. In the case *sub judice,* the Court of Special Appeals relied on our holding in *Collins v. State,* 322 Md. 675, 589 A.2d 479 (1991), as the basis for its evaluation of probable cause. In that case, this Court stated:

"A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion.

\* \* \*

"Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge. Probable cause exists where the facts and circumstances taken as a whole would lead a reasonably cautious person to believe that a felony had been or is being committed by the person

conclusion was supported, the intermediate appellate court explained, by the following factors, which it enumerated as informing its decision:

"1. Detective Smith received a call from a confidential source who had provided reliable drug related information in the past.

"2. The source informed the detective that he had observed and videotaped what he believed was a drug transaction involving appellant and Carlson, a man the source knew to have been involved in drug transactions.

"3. The detective observed the videotape twice and concluded, based on his experience, that in fact a drug transaction had occurred.

"4. The police observed the three men shown in the videotaped transaction meet again at a kiosk in the mall.

"5. The police found, in a subsequent stop of Carlson's vehicle, a quantity of marijuana and a trace amount of cocaine.

"6. The police learned that appellant had prior drug arrests.

"7. During a subsequent stop of appellant's car, appellant acted 'extremely nervous' when asked if he was transporting drugs."

Not included in this list of factors, but clearly something to be taken into account in assessing probable cause, is the first of the three drug dog sniffs of the petitioner's vehicle. That sniff, which was singularly unsuccessful,[12] occurred while the

---

arrested. Therefore, to justify a warrantless arrest the police must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."

322 Md. at 679–680, 589 A.2d at 481 (citations omitted).

**12.** We note that there were two later drug dog sniffs, a second, of the exterior of the petitioner's vehicle, that occurred after the petitioner was stopped and placed under arrest, and the third one, of the interior of the vehicle. Because they were post-arrest, these latest drug dog

petitioner's vehicle was parked on the shopping mall parking lot and he was inside the mall with Carlson and the third man, with whom he had been seen. Aware of that drug dog sniff and its lack of results, to be sure, the Court of Special Appeals disposed of it dismissively and without significant discussion, stating simply, "the dog's failure to alert during the first scan does not weigh too heavily in the probable cause calculus."

The intermediate appellate court did not explain why the failed sniff did not weigh "too heavily in" its analysis. But that is the crux of the case: because it is a factor militating against a finding of probable cause, did that failure, weighed sufficiently, significantly negate or neutralize those several factors that militate in favor of such a finding.

We have held, to be sure, that "once a drug dog has alerted a trooper to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle]." *Wilkes v. State*, 364 Md. 554, 586, 774 A.2d 420, 439 (2001) (internal quotations omitted). In addition, in *McKay v. State*, 149 Md.App. 176, 188, 814 A.2d 592, 599 (2002), on which the State strongly relies, the Court of Special Appeals opined that "a drug sniffing dog's failure to detect drugs does not automatically negate probable cause. It is, instead, but one factor to be considered in the probable cause determination."

The context in which the intermediate appellate court expressed that opinion is both enlightening and significant. In *McKay*, police obtained information from a named source that one of the defendants was the source of drugs for his mother. 149 Md.App. at 180, 814 A.2d at 594. After confirming certain of this information as to that defendant's mother, an officer, having made several hand-to-hand purchases from the mother, advised her that he was a police officer and obtained from her

sniffs cannot be considered in the probable cause analysis. They do constitute, however, part of the totality of the circumstances surrounding the search. Thus, to the extent that these sniffs may elucidate a relevant aspect of the probable cause construct, they may, and as we will see, will, be used.

an admission that the defendant was her source and her agreement to cooperate with the police. *Id.* Subsequently, the defendant's mother arranged for the defendant to deliver cocaine hydrochloride to her place of employment; she informed the police of this arrangement. 149 Md.App. at 181, 814 A.2d at 595. As planned, the defendant was stopped on a traffic violation, a missing front registration plate, on his way to make the delivery. The police request to search the car was refused, whereupon a drug sniffing dog was called to the scene. 149 Md.App. at 182, 814 A.2d at 595. Although its scan of the vehicle was unsuccessful, 149 Md.App. at 182, 814 A.2d at 595, the police searched the car anyway, finding the controlled dangerous substances they expected to find. 149 Md.App. at 182, 814 A.2d at 595. The defendant moved to suppress the evidence, arguing initially that neither the informants nor the information they provided was reliable. *Id.* at 182, 814 A.2d at 596. Alternatively, he argued that, "even assuming the police were initially possessed of probable cause, it was dissipated when the dog failed to alert on the car." *Id.*

The court rejected both arguments. With respect to the first, applying a totality of the circumstances analysis, it concluded that the police had probable cause to search the defendant's car. 149 Md.App. at 185–86, 814 A.2d at 597–98. That determination, it said, "was not even a 'close call.' " *Id.* at 188, 814 A.2d at 599. Giving deference to the trial court's factual determination with respect to the reasonableness of the explanation for the drug dog's non-alert, the Court of Special Appeals concluded that there was no merit in the defendant's alternative argument, either. It explained:

> "The suppression court heard testimony that the dog's failure to alert was due to its being on medication. The court apparently credited that testimony, as reflected by the court's comment that 'sometimes you just have incompetent dogs.' We treat that determination as fact. *State v. Brooks*, 148 Md.App. 374, 402, 812 A.2d 342 (2002). Considered in the totality of the circumstances, the dog's non-alert-particularly in view of the reasonable explanation for it-did

not negate the probable cause necessary for the search of the car."

*McKay,* 149 Md.App. at 188, 814 A.2d at 599.[13]

While we agree that a failed dog drug sniff does not automatically negate probable cause, the trial court, although noting the findings of the drug dog, did not consider the failed sniff as negative evidence in its probable cause determination. Furthermore, it is clear that the Court of Special Appeals either did not consider the failed sniff as a factor, as *McKay* dictates, or weighed it insufficiently.

We do not agree with either court's lack of consideration given to the failed sniff in their probable cause determinations. The failed drug sniff is exactly the type of evidence that tends to undermine the conclusion of the presence of drugs. It is a negating factor that has a substantial impact on the determination of probable cause, and cannot be lightly

---

**13.** The intermediate appellate court also relied on *United States v. Jodoin,* 672 F.2d 232, 234 (1st Cir.1982) and *State v. Siluk,* 567 So.2d 26, 27 (Fla.App.1990). In *Jodoin,* an explanation was given at trial, by the dog's handler's, presumably as expert witness for the dog's non alert. There, as related by the court, it was:

"Although a drug detecting dog did not react when it sniffed the suitcase, the agents pointed out that, according to dog handlers, 'the dogs are not foolproof,' they 'are less accurate on hot muggy days,' and drug traffickers have found ways 'to mask the odors of contraband to fool detection efforts.' The dog's failure to react does not, in our view, destroy the 'probable cause' that would otherwise exist. It is just another element to be considered by the magistrate."

*Id.* at 236. In *Siluk,* the court held that, where a drug sniffing dog in Houston, Texas, earlier had alerted to the defendant's suitcase, a subsequent failure to alert by a second dog at the Orlando airport did not neutralize the probable cause provided by the first alert, explaining:

"We do not accept the argument that the failure of the local narcotics dog to 'alert' to the luggage neutralized the probable cause flowing from the alert in Houston, where, as here, it was improbable that anyone had access to the suitcase between the time it left police surveillance in Houston and came under surveillance in Orlando. Moreover, although the officer in Houston was not known to the officer in Orlando, he provided such specific and detailed information that the Orlando officer was reasonable in his conclusion that the source of information about the defendant's luggage was a fellow law enforcement officer whose information was truthful and reliable."

567 So.2d at 28.

ignored. Moreover, the weight to be given to the dog sniff is directly related to the credibility of the dog's abilities, which, in turn, can be inferred from the dog's performance under the circumstances. If a dog fails to alert to the presence of drugs, and no explanation for why such a failure occurred is given, the trial court should weigh this differently than it would a failure of a drug dog to alert, accompanied by a plausible justification for the failure. Additionally, any inconsistencies between multiple alert results must be taken into consideration, under the totality of the circumstances.

The first sniff was conducted while Longshore's car was parked in the mall lot. The dog failed to alert. The dog handler explained at trial that this was not a surprise, since "during the first scan there was no 'air exchange' as the windows were up, the doors closed, and the engine was not running." During the dog's second scan, however, where "a window was down and, just seconds before, the engine had been running," the drug dog alerted to the rear of the vehicle just underneath the rear bumper—a false alert. This second scan contradicts the rationale given by the police for Tonya's failed first sniff. It was only when the dog was actually let inside the vehicle that she was able to alert to the presence of drugs. These three inconsistent alerts severely undermine dog's credibility as a reliable indicator of the presence of drugs. Thus, as a negating factor in the probable cause determination, we believe that the drug dog's failure to alert during its first scan of Longshore's car should have been given considerable weight in light of the other factors and circumstances.

While we agree with the holding in *McKay*, it is not wholly applicable here, as the State asserts. The drug sniffing dog in *McKay* had been treated with medication, 149 Md.App. at 188, 814 A.2d at 599; thus, there was an explanation, a basis, for the non alert. Tonya had not been medicated or, at least, no evidence to that effect was offered. As we have seen, the explanation that was offered did not prove to be credible, in light of subsequent scans. Tonya's failed sniff certainly did *not* give the police any *more* reason to search Longshore's

vehicle. Indeed, in light of that failed sniff or scan, the subsequent police actions had the feel and effect of "fishing."

Given the lack of reliability of the drug dog and the other factual circumstances taken in concert, we cannot conclude that there is a substantial basis for the determination of the existence of probable cause. The police received a call from a confidential source who had provided reliable drug information in the past, and this source informed the police detective that he had observed and videotaped what he believed was a drug transaction involving appellant and Carlson, a man the source knew to have been involved in drug transactions. While the informant claimed that the tape showed Longshore and Carlson making some sort of exchange inside the vehicle, it only displayed two men getting into a car while a third person waited outside of the car. Despite the obvious lack of visual proof, the detective observed the videotape twice, and concluded, based on his experience, that a drug transaction had occurred.

■■■ In a probable cause determination, "the experience and special knowledge of police officers who are [attempting to establish probable cause] are among the facts which may be considered." *Wood v. State*, 185 Md. 280, 286, 44 A.2d 859, 861 (1945). The observations of the police, however, must be based on something factual. In the case *sub judice*, while the police did see two men enter a car and one man stand outside the car, the videotape did not reveal any actual hand to hand drug transfer, money transfer, or drug paraphernalia transfer. Moreover, aside from viewing three men on a videotape and congregating together at the mall, nothing suspicious and certainly nothing criminal was observed.

Trace amounts of drugs were discovered in the car of one of the three men, when it was stopped by the police; that man, however, did not indicate that he had purchased the drugs from Longshore. The State emphasizes Longshore's history of prior drug arrests. We have, however, previously cautioned, "to be satisfied based upon a person's status [of having a prior drug arrest record], rather than an individualized

assessment of the circumstances, would undermine the purpose for requiring officers to justify their reasons for searching a particular individual." *Nieves,* 383 Md. at 597, 861 A.2d at 77. Finally, the State notes that Longshore acted extremely nervous when asked if there were drugs in the car. We also have cautioned against placing too much weight on the perception of nervousness when assessing probable cause or reasonable suspicion, as certain behaviors are ordinary for any person when confronted by police. *Ferris,* 355 Md. at 389, 735 A.2d at 509.

What we are left with is a videotape that, although coming from a previously reliable source, reflects no drug activity, only innocuous or at worst ambiguous, behavior, occurring primarily in a public setting, trace amounts of drugs with no immediate or clear connection to Longshore, a prior criminal record, nervous behavior, and inconsistent results—she twice failed to alert to the presence of drugs—from a drug dog. While these facts may have provided an officer reasonable suspicion to conduct further investigation, they do not provide a substantial basis for a determination of probable cause, the standard by which we are bound to evaluate the validity of the petitioner's arrest. To agree that probable cause existed at the time of the petitioner's arrest, as the State contends, would force this Court to fill in gaps in the record, an exercise we are not permitted to do. We reverse on this point.

## II.

The trial court also erred in admitting testimony that the petitioner refused to consent to a search of his vehicle. That evidence was inadmissible and it was prejudicial. The trial court abused its discretion in not granting a mistrial.

During the State's case in chief, Detective Edge testified about the encounter with petitioner. After Detective Edge stopped the petitioner's automobile, he asked him for consent to search the car. The following conversation took place:

[PROSECUTOR]: What, if anything, did you do when the car came to a stop?

[DETECTIVE]: The patrol officer had—I had him ask him to step to the rear of his vehicle. At which time I made contact with the suspect and advised him why he was being stopped, and asked him for consent to search his vehicle.

[PROSECUTOR]: What, if anything, happened at that point?

[DETECTIVE]: *He denied consent.*

[DEFENSE COUNSEL]: Objection.

[THE COURT:] Sustained.

At the bench, defense counsel moved for a mistrial, which the trial judge denied. The court instead gave the jury a "curative instruction," stating as follows:

"Ladies and gentlemen, I instruct you to disregard what the Officer said with regard to the defendant's response to the request to search the vehicle. For purposes of this proceeding that is immaterial."

The Court of Special Appeals rejected the petitioner's argument that the trial court had abused its discretion in denying his motion for mistrial, noting:

"[W]e see that it was a single, isolated statement; it was solicited by the State only in the sense that it was made in response to a question posed by the State, but it appears that the question was not intended to obtain the testimony given, and that the answer given was unexpected; Detective Edge was one of several witnesses; and there was a great deal of other evidence of appellant's guilt, including the videotape of the suspected drug transaction and the fact that Carlson's car contained drugs when stopped."

The petitioner contends again, at this appellate level, that the trial court noted correctly that Detective Edge's testimony that the petitioner denied consent to search his car was inadmissible, but that the court abused its discretion in refusing to grant a mistrial. He asserts that the trial court erred in denying his motion for a mistrial when the Detective testified that the petitioner refused to consent to a search of his vehicle. The petitioner argues additionally that the curative

instruction was insufficient to protect his right to a fair trial. We agree.

In holding that evidence of a refusal to consent to search is inadmissible, many courts have drawn an apt analogy to United States Supreme Court cases that hold that a defendant's assertion of the Fifth Amendment right to remain silent may not be used against him or her at trial. *See, e.g., Simmons v. State,* 308 S.C. 481, 419 S.E.2d 225, 226 (1992); *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Those courts note that a like principle applies to refusal to consent to search. *See, e.g., Elson v. State,* 659 P.2d 1195, 1197 (Alaska 1983); *Garcia v. State,* 103 N.M. 713, 712 P.2d 1375, 1376 (1986). In *Reeves v. State,* 969 S.W.2d 471 (Tex.App.1998), the court noted as follows:

> "Because the right to refuse entry is equally available to the innocent and the guilty, the refusal is as 'ambiguous' as silence which is maintained as a right under the Fifth Amendment. To allow the use of one's refusal to consent to entry into his home without a warrant would be to impose a penalty for exercising a constitutional right. Allowing evidence of [the defendant's] refusal to consent to a warrantless search of his home was error."

*Id.* at 495 (internal citations omitted). An individual's assertion of the constitutional right to refuse a search of his car cannot be used as evidence of his guilt if the constitutional protection against unreasonable search and seizure is to have any meaning.

A person has a constitutional right to refuse to consent to a warrantless search of his or her automobile, and such refusal may not later be used to implicate guilt. An unfair and impermissible burden would be placed upon the assertion of a constitutional right if the State could use a refusal to a warrantless search against an individual. *See, e.g., United States v. Prescott,* 581 F.2d 1343, 1351 (9th Cir.1978); *Garcia v. State,* 103 N.M. 713, 712 P.2d 1375, 1376 (1986). Moreover, a person's refusal to consent to a warrantless

search cannot form the basis of reasonable suspicion or probable cause. *See Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) (noting that "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure"); *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (holding that a person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds"); *United States v. Wood,* 106 F.3d 942, 946 (10th Cir.1997) (holding that "[t]he failure to consent to a search cannot form any part of the basis for reasonable suspicion"). *See also* Kenneth J. Melilli, *The Consequences of Refusing Consent to a Search or Seizure: The Unfortunate Constitutionalization of an Evidentiary Issue,* 75 S. Cal. L.Rev. 901, 937 (2002) (rejecting the constitutionalization of what the author terms an evidentiary issue, stating that evidence of refusal to consent is inadmissible ordinarily, not necessarily because it punishes a person for assertion of a constitutional right, but because refusal to consent is not probative of guilt or suspicion and is thus irrelevant).

 The petitioner was prejudiced by the inadmissible testimony and the instruction of the court to disregard the testimony did not cure the error. The State's argument that Detective Edge's testimony was not solicited or expected by the State does not diminish the prejudice to petitioner. This is not a question of good faith/bad faith on the part of the State. An important issue in the case was whether petitioner had knowledge of the contraband contained within the car. The jury may have considered his refusal to consent to search as evidence of knowledge that the drugs were within the automobile. We cannot say that the error was harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT

WITH INSTRUCTIONS TO REMAND TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; CASE REMANDED TO THAT COURT FOR NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY CHARLES COUNTY.